# EXHIBIT 1

# The Anticompetitive Effects of the Proposed Capital One-Discover Merger

**April 2024**



*ANTICOMPETITIVE EFFECTS OF THE PROPOSED CAPITAL ONE-DISCOVER MERGER*

I.     INTRODUCTION ................................................................................................................ 1

II.    THE MERGER CREATES A BANK BEHEMOTH ................................................................ 4

    A.     THE MERGER EXACERBATES THE PAYMENTS NETWORK OLIGOPOLY PROBLEM ...................... 6

III.   HORIZONTAL MERGER OF MAJOR CREDIT CARD ISSUERS WOULD SUBSTANTIALLY LESSEN COMPETITION AND HARM CONSUMERS ........................................................................................................ 7

    *Merger between general-purpose credit card issuers with outstanding loans: ................................. 8*

    A.     MERGER WOULD WORSEN CARDHOLDER LOCK-IN — CAPTIVE CONSUMERS CANNOT EASILY SWITCH IN THE FACE OF PRICE HIKES. 9

    B.     MERGER WOULD INCREASE CONSOLIDATION IN ALREADY CONCENTRATED CREDIT CARD MARKET ........................ 11

    C.     MERGER WOULD CREATE CONCENTRATED NON-PRIME CREDIT CARD MARKET, DISPROPORTIONATELY HARMING BLACK, LATINE, AND LOWER-INCOME CONSUMERS ................................................................ 14

    D.     MERGER WOULD WORSEN OLIGOPOLISTIC TENDENCIES TO EXTRACT EXCESS PROFITS AND IMPOSE COORDINATED PRICES ........ 17

    *Proposed merger could entrench coordinated pricing strategies that harm consumers: ................................* 18

IV.    MERGER COMBINES HUNDREDS OF MILLIONS OF CARDHOLDERS' DATA, REDUCING THE DATA SECURITY AND PRIVACY OF DISCOVER CUSTOMERS ............................................................. 20

    *Credit card firms collect and exploit personal data: .......................................................... 22*

    *Merger would move customers to Capital One' aggressive data harvesting and exploitation: .................... 23*

    *Merger would move customers to Capital One's weaker privacy protections: ................................... 24*

V.     VERTICAL BRANDED CREDIT CARD MERGER WOULD WORSEN COMPETITION BY ELIMINATING MAVERICK, DESPITE PRO-COMPETITION RHETORIC ........................................................................ 26

    A.     PURPORTED PRO-COMPETITIVE BENEFIT MISLEADING AND DOES NOT OUTWEIGH ANTICOMPETITIVE EFFECTS OF MERGER ........ 27

    B.     MERGER WOULD DISPLACE MASTERCARD BUT MAINTAIN CURRENT MARKET STRUCTURE ................................ 28

    C.     MERGER TRANSFORMS DISCOVER FROM MAVERICK TO MARKET LEADER AND RAISES CONSUMER AND MERCHANT COSTS ........ 29

VI.    MERGER WOULD FACILITATE ANTICOMPETITIVE REGULATORY EVASION ON DEBIT CARD FEES ................. 32

VII.   MERGER WOULD CREATE PLATFORM CONFLICT OF INTEREST WITH BRANCH BANKING RIVALS ON DISCOVER'S DEBIT NETWORKS ...................................................................................... 36

    *Debit networks exercise their market power to disadvantage merchants and smaller banks: ..................... 37*

VIII.  CONCLUSION .................................................................................................................. 40

IX.    APPENDIX ...................................................................................................................... 41

Americans for Financial Reform Education Fund (AFREF) is a nonpartisan, nonprofit coalition of more than 200 civil rights, community-based, consumer, labor, business, investor, faith-based and civic groups, along with individual experts. Our mission is to fight to create a financial system that deconstructs systemic racism and inequality and promotes a just and sustainable economy. Learn more at www.ourfinancialsecurity.org.

# I.    Introduction

The proposed Capital One Financial Corporation acquisition of Discover Financial Services would substantially erode competition and disadvantage consumers and merchants. The transaction would create the nation's biggest credit card lender, one of the biggest banks, and a powerful vertically integrated payments network combined with a branch bank and credit card issuer. The combined firm would hold over 22 percent of outstanding credit card loans including over 30 percent of loans to consumers with non-prime credit scores. The combined firm would have the scale and scope to profitably exert market power over its customers, merchants, and rivals. The size and complexity of the transaction immediately makes it clear that it warrants close and skeptical scrutiny; a closer look will show that ultimately the antitrust and banking regulators must block the merger to protect consumers from the anticompetitive exercise of consolidated market power.

The $35.3 billion Capital One Financial Corporation (Capital One)-Discover Financial Services (Discover) merger would be a significant banking and financial services combination.[1] It would create the sixth largest banking company in the country by assets with $624 billion in consolidated domestic assets by combining the ninth place Capital One Financial Corporation (Capital One) with the 27th largest Discover Financial Services (Discover).[2] The merger will affect millions of households. Discover currently has over 300 million cardholders (including Discover, Diners Club, and depositor debit cards) and Capital One has 100 million cardholders (including Capital One credit cards and depositor debit cards).[3] The scale of the combined firm will give it the resources to exercise market power in the markets where the parties were formerly rivals — primarily credit card lending — as well as new arenas where the combination creates vertical alignment between payments networks, credit card lending, and debit transactions.

The proposed transaction has horizontal (banking and credit card lending) and vertical (credit card and debit payments networks) dimensions that create market power that the merged firm would have the ability and incentive to exercise to profitably disadvantage its customers and rivals. These markets have been consolidating for decades and today a few firms dominate credit card lending and payments networks. The merger eliminates a credit card lending rivalry, creates more concentrated credit card lending markets and highly concentrated credit card lending markets for consumers with non-prime credit scores who have fewer choices and pay higher prices. The merger also gives Capital One the market power to use its aggressive data analytics and weaker privacy protection practices to extract value from Discover cardholders and compromise their personal data.

---

[1] Capital One. [Press release]. (Capital One press release). "Capital One to acquire Discover." February 19, 2024.
[2] Federal Reserve Board. "Insured U.S.-Chartered Commercial Banks That Have Consolidated Assets of $300 Million Or More, Ranked by Consolidated Assets." December 31, 2023.
[3] Hirsch, Lauren and Emma Goldberg. (Hirsch and Goldberg). "Capital One to acquire Discover, creating a consumer lending colossus." *New York Times*. February 19, 2024; Capital One Financial Corporation and Discover Financial Services. (Capital One-Discover Investor Presentation), Investor Presentation. February 20, 2024 at 9.

The combination of Capital One's credit card lending and depository debit transactions and Discover's credit card and debit payment networks creates the first payments network backed by one of the biggest banks with retail branches, enhancing the combined institutions' market power. The transaction would allow Capital One to shift its debit transactions to Discover's debit network, and that would allow it to evade the federal regulations governing debit interchange fee caps, giving it an anticompetitive edge over its banking rivals. It would also create important network conflicts of interest between Capital One's depositor debit transactions and the 4,000 other banks on Discover's Pulse debit network — including many smaller institutions that rely on these debit network services and may compete with Capital One for deposits in markets where Capital One has branches.

The combination of two powerful credit card lenders and a payments network will worsen not restore competition in credit cards. Capital One contends that the transaction is pro-competitive because it will allegedly enable the combined firm to challenge the entrenched dominant payment networks primarily controlled by Visa and Mastercard. In reality, the merger will only rearrange the oligopolistic credit card players, shifting Capital One's credit cards to Discover and supplanting Mastercard as the number two in the market. That will not change the structure of the market or inject competition into the credit card market. But it will eliminate the incentive Discover has to compete as a maverick that offers credit cards with lower interest rates and higher quality to compete with the bigger players, as it does today.

Federal antitrust law forbids mergers of the size and scope of the Capital One-Discover transaction that increase, extend, or entrench market power and erode the competition that can lower prices, improve quality, and expand choice. The Clayton Antitrust Act prohibits mergers "where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly."[4] The Bank Merger Act and the Bank Holding Company Act mirrors the Clayton Act language and prohibit bank mergers whose result "may be substantially to lessen competition, or to tend to create a monopoly, or which in any other manner would be in restraint of trade."[5]

It is particularly critical to guard against consolidation in the banking sector and prevent anticompetitive bank mergers. The intent of the antitrust laws including the Clayton Act and Bank Merger Act was not solely to prevent narrow concentrations in local depository institutions, but to prevent the concentration of economic power that could undermine shared prosperity and democracy. As the Supreme Court wrote in U.S. v. Philadelphia National Bank "if the businessman is denied credit because his banking alternatives have been eliminated by mergers, the whole edifice of an entrepreneurial system is threatened; if the costs of banking services and credit

---

[4] 15 USC §18.

[5] The language mirrors the Clayton Act and includes restraint of trade. 12 USC §1828(c)(5)(B) and 12 USC 1842(c)(1)(B).

are allowed to become excessive by the absence of competitive pressures, virtually all costs, in our credit economy, will be affected."[6] The concentration of financial and market power in the hands of a small cadre of megabanks contributes to economic and racial inequality. Banks allocate capital and act as gatekeepers to financial success and the biggest banks can concentrate economic resources to entrench corporate titans in other economic sectors.

This analysis demonstrates the dimensions and magnitude of the harms to competition from the proposed Capital One-Discover merger.

- **Section II** describes the broad contours of the proposed merger between large national banks as well as between a large bank with retail branches and a payments network.

- **Section III** details how the proposed merger would combine the third and fourth largest credit card lenders, creating the nation's largest credit card lender with 22 percent of outstanding loans. It also would create the largest credit card lender to consumers with non-prime credit scores, a presumptively violative significant increase in market concentration to over 30 percent that disproportionately harms Black and Latine consumers. The section also describes the consumer barriers to switching to alternate credit cards in the face of price increases, the trend towards increased concentration in credit card lending, immediate price hikes Discover customers would likely face, and the likelihood that the merger would increase tacit coordination and price increases.

- **Section IV** describes how the proposed merger would increase Capital One's market power in consumer data and enable it to extract and exploit consumers' personal information and violate their privacy, especially with regard to the 300 million Discover cardholders whose data would newly be covered by weaker privacy policies.

- **Section V** presents how the proposed merger would worsen concentrated market power in branded credit cards by eliminating the incentive Discover now has to compete as a maverick by offering credit cards with lower prices and higher quality. Contrary to Capital One's contention that the merger would inject competition into credit card markets, the merger would merely shift which players enjoy a duopoly, and eliminate Discover's maverick role in credit card networks.

- **Section VI** discusses how the merger would enable Capital One to evade federal debit interchange fee caps by shifting business to Discover's signature debit card and impose anticompetitive and higher prices on merchants (that are ultimately passed on to consumers).

- **Section VII** describes how the merger would give Capital One the ability and incentive to disadvantage the 4,100 branch banks that rely on Discover's Pulse

---

[6] U.S. v. Philadelphia Nat. Bank. (U.S. v. PNB). [374 U.S. 321](#) (1963) at note 41 at 372.

*ANTICOMPETITIVE EFFECTS OF THE PROPOSED CAPITAL ONE-DISCOVER MERGER*

debit network. The merger would give Capital One control over the debit network its rival branch banks rely upon and give it the ability and incentive to disadvantage their access to the network.

## II.   The merger creates a bank behemoth

The Capital One-Discover merger is a horizontal bank merger that joins two of the nation's largest banks and creates the biggest credit card lender by outstanding loan balances. The merged firm would be the fifth largest bank holding company by deposits with nearly $470 billion in deposits (currently Capital One ranks 8th with $367.8 billion in deposits and Discover ranks 26th with $101.2 billion in deposits).[7] Capital One founder and CEO Richard Fairbank explained how the merger would entrench the banks market power, stating that "the addition of Discover will increase our scale to compete with the nation's largest banks. In addition to scale, the Discover network brings a significant opportunity to accelerate the growth of our full-service national bank, as vertical integration enhances the scale and economics of our debit business."[8] The *New York Times* called the merger the creation of a "consumer lending colossus."[9]

Discover is a digital national direct savings bank that competes with the nation's largest banks and it has been accelerating its banking growth.[10] Discover's digital banking includes credit card lending, online banking, personal loans, and mortgage lending.[11] Capital One also operates as a full-service digital bank but it also has 259 branches in 21 of the 25 largest metropolitan areas, 80,000 fee-free ATMS, and 16,000 cash deposit locations.[12] It also operates Capital One Cafés that combine coffee shops, co-working sites, and house Capital One financial coaches. These act as physical digital banking branches that supplement branches in some places and create a physical presence in cities where Capital One has no retail branching presence.[13] Capital One offers deposits (checking and savings), credit cards, small business loans, and automobile loans.[14]

Mergers create larger banks that can exercise market power to impose higher costs on consumers, reduce the volume or quality of banking services, or become so large that they pose a risk to the entire financial system and real economy. The large

---

[7] The combination would be sixth largest in terms of consolidated domestic assets. Federal Deposit Insurance Corporation. Summaries of Deposits–Market Share Reports. Holding Companies with Subsidiaries. December 31, 2023.

[8] Capital One Financial Corporation. (Capital One Investor Call). "Capital One Financial Investor Presentation Call." February 20, 2024 at 19:50.

[9] Hirsch and Goldberg. 2024.

[10] Capital One press release. 2024.

[11] Son, Hugh. (Son). "Here's why Capital One is buying Discover in biggest proposed merger of 2024." *CNBC*. February 21, 2024; Capital One-Discover Investor Presentation. 2024 at 6.

[12] Capital One press release. 2024.

[13] Streeter, Bill. "Chatbots and Cafés: How Capital One balances digital, physical banking." *Financial Brand*. May 14, 2021.

[14] Huffman, Lee. (Huffman). "Capital One Deal for Discover Could affect what's in your wallet." *US News and World Report*. February 20, 2024.

number of mega-mergers that regulators approved between 1995 and 2005 concentrated financial risk into larger banks creating systemic fragility that contributed to the 2008 financial crisis. A 2016 University of Pennsylvania paper found that the bank mergers and rising concentration led to higher leverage levels and lower levels of capitalization.[15] A 2017 Harvard University paper noted that deregulation that led to accelerated bank mergers and consolidation increased interconnectedness that "increased the chances of a large shock occurring."[16] A 2014 *Journal of Banking & Finance* study of 440 bank acquisitions between 1991 and 2009 found that "mergers coincide with statistically and economically significant increase in the contribution of the acquirer to the systemic risk of the financial sector."[17] Some of the banks that had ballooned through a series of rubber-stamped mergers failed during the financial crisis and these failures reverberated across the economy and contributed to job losses, the erosion of household wealth, and millions of foreclosures which disproportionately harmed Black and Latine families.

The increasingly large banks created by decades of consolidation have exercised their market power to the detriment of consumers, customers, and communities by raising prices and or reducing the quality or range of services. Bank mergers have driven higher bank fees and higher costs to maintain accounts, which has an especially harmful impact on lower-income households.[18] Merging banks reduce the volume, increase the cost, and lower the access to affordable mortgage credit and these detrimental effects are more pronounced for families of color, lower-income families, lower-income areas, and communities of color.[19] Bank consolidation can reduce small business lending and have a disproportionately negative impact on the ability of businesses owned by people of color and women as well as all very small businesses to access credit.[20]

---

[15] Kim, JinAh and Katja Seim. University of Pennsylvania. Wharton School of Business. "Effects of Bank mergers on risk leading up to the 2007-2008 financial crisis." 2016 at 14.

[16] Zhang, Jeffery Y. Harvard University. John M. Olin Center for Law, Economics, and Business. Discussion Paper No. 69. "The Costs and Benefits of Banking Deregulation." April 25, 2017 at 38.

[17] Weiss, Gregor N.F., Sascha Neumann, and Denefa Bostandzic. "Systemic risk and bank consolidation: International evidence." *Journal of Banking & Finance.* Vol. 40. 2014 at 166.

[18] Bord, Vitay M. Harvard University. "Bank Consolidation and Financial Inclusion: The Adverse Effects of Bank Mergers on Depositors." December 1, 2018; Kahn, Charles, George Pennacchi, and Ben Spranzetti. "Bank consolidation and the dynamics of consumer loan interest rates." *Journal of Business.* Vol. 78, No. 1. 2005; Carletti, Elena, Philipp Hartmann, and Giancarlo Spagnolo. "Implications of the bank merger wave for competition and stability." *Risk Measurement and Systemic Risk, Proceedings of the Third Joint Central Bank Research Conference.* January 2002; Weinberg, Matthew. University of Georgia, Center for Economic Policy Studies. "The Price Effects of Horizontal Merges: A Survey." CEPS Working Paper No. 140. January 2007.

[19] Ratnadiwakara, Dimuthu and Vijay Yerramilli. Louisiana State University and University of Houston. "Effect of Bank Mergers on the Price and Availability of Mortgage Credit." September 2020; Gam, Yong Kyu and Yunqi Zhang. Southwestern University of Finance and Economics and Nankai University. "Dismembered Giants: Bank Divestitures, Local Lending, and Housing Markets." 55th American Real Estate and Urban Economics Association. San Diego. January 3-5, 2019; Scharfstein, David and Adi Sunderam. Harvard University and National Bureau of Economic Research. "Concentration in Mortgage Lending, Refinancing Activity, and Mortgage Rates." NBER Working Paper No. 19156. June 2013.

[20] Samolyk, Katherine and Christopher A. Richardson. Federal Deposit Insurance Corporation. Working Paper 2003-02. "Bank consolidation and small business lending within local markets." April 2003; Carletti, Hartmann, and Spagnolo (2002); Nguyen, Hoai-Luu. Massachusetts Institute of Technology. "Do Bank Branches Still Matter? The Effect of Closing on Local Economic Outcomes." December 2014; Minton, Bernadette A., Alvaro G. Taboada, and Rohan Williamson. Ohio State

### A.  The merger exacerbates the payments network oligopoly problem

The Capital One-Discover acquisition is a unique vertical merger between a bank and a payment network. Today, no major bank with retail branches controls a payment network (although American Express and Discover have chartered banks that issue credit card loans). The proposed Capital One-Discover merger could strengthen Discover's credit and debit networks and allow it to exercise undue market power to disadvantage customers, merchants, and rivals. The merger will not enhance competition in the credit and debit, as Capital One has contended, it will significantly erode competition through the vertical combination of one of the nation's largest banks with a global payments network.

Discover's payment network includes the Discover Card, Diners Club International, and the Pulse debit network that processes transactions for Discover products (credit and debit cards) and provides payment and transaction processing and settlement between consumers and merchants.[21] Discover also holds non-controlling investments in "several payment services," some privately held and some publicly traded.[22] In touting the merger, Capital One CEO Richard Fairbank stated that a "network is a very, very rare asset, there are very few of them and people are not going to be building any of them any time soon."[23]

Payment card networks — both for debit and credit cards — are essentially two-sided networks that connect cardholders to merchants. The networks are more functional and valuable with more cardholders and more merchants that accept the payment sources. Banks offer depositors and customers branded credit and debit cards that access the payment networks. The credit card and debit card networks utilize similar architecture that authorizes and settles the transaction. The companies that operate the networks (Visa, Mastercard, American Express, and Discover for credit cards and those same companies as well as regional electronic funds networks for debit transactions) coordinate and settle the transactions and set the terms and prices (interchange fees) for issuers (banks), merchants (and merchants' banks, known as merchant acquirers), and ultimately consumers. Bank issuers directly set the prices and terms for cardholders (such as interest rates and fees for credit cards and ATM fees for debit cards).

Bigger networks are more valuable and create greater incentives for more merchants and customer participants. The merger would create a much heftier Capital One-Discover pool of cardholders and transactions. The 2023 Merger Guidelines warn

---

University, Mississippi State University, and Georgetown University. "Bank Mergers and Small Business Lending: Implications for Community Development." Paper presented at Financial Management Association 2019 Conference, New Orleans. October 23 to 26, 2019.

[21] Discover Financial Services. (Discover SEC Form 10-K). U.S. Securities and Exchange Commission. Form 10-K. 2023 at 1; Capital One-Discover Investor Presentation. 2024 at 6.

[22] Discover SEC Form 10-K. 2023 at 101.

[23] Capital One Investor Call. 2024 at 37:25.

that "network effects can create a tendency toward concentration."[24] Generally, customers would prefer a network that has more merchants and merchants would prefer a network with more potential customers and that dynamic can create a domino effect that expands big networks. Additionally, because building and maintaining networks is expensive and difficult, there are high barriers to entry that make it hard to start new networks from scratch.

The four credit card networks have been entrenched for decades; the newest, Discover, was launched in the 1980s.[25] The existence of only four entrenched incumbent payment networks allows the oligopoly to maintain transaction prices (interchange fees) that can exceed costs and use their market power to capture excess profits. A Federal Reserve Bank of Kansas City research paper found that the "market power of credit card networks plays a critical role in determining card pricing" and that "card networks demand higher interchange fees to maximize card issuers' profits as card payments become more efficient."[26]

## III.   Horizontal merger of major credit card issuers would substantially lessen competition and harm consumers

The proposed Capital One-Discover acquisition is a horizontal merger of credit card issuers that increases market power that is likely to substantially lessen competition or tend to create monopoly power. The merger joins two of the biggest credit card-issuing lenders (number 3 and number 4 by total outstanding loans) to create the biggest general purpose credit card lender with over one-fifth of the market and $250 billion in outstanding loans and 75 million credit cardholders.[27] The concentration is more acute in the non-prime credit card market, where the combined firm would control over 30 percent of the market. The merger would diminish competitive constraints, reduce the number of credit card options for consumers, and give the combined company the ability to profitably raise prices for consumers and merchants.

The acquisition raises several prima facie concerns that the resulting firm would substantially lessen competition or tend to create a monopoly. The general-purpose credit card lending market is already considerably concentrated with the four largest

---

[24] U.S. Department of Justice and Federal Trade Commission. (DOJ/FTC 2023 Merger Guidelines). 2023 Merger Guidelines. December 18, 2023 at 24.

[25] Consumer Financial Protection Bureau (CFPB). (CFPB Consumer Credit Card Market). "The Consumer Credit Card Market." October 2023 at 27.

[26] Wang, Zhu. (Wang). Federal Reserve Bank of Kansas City. "Market Structure and Credit Card Pricing: What Drives the Interchange?" Working Paper No. 06-04. December 20, 2006 at 6 to 7.

[27] Capital One Financial Corporation. (Capital One SEC Form 10-K). SEC Form 10-K. 2023 at 90 to 91, and 94; Discover SEC Form 10-K. 2023 at 64 and 102; Discover has over 300 million total cardholders (including Discover credit cards, Diners Club cards, Discover debit cards, and debit cards on the Pulse network) and Capital One has over 100 million cardholders (including credit and debit cards). There are approximately 50 million Discover credit cards and 25 million Capital One credit cards. Hirsch and Goldberg. 2024; Caporal, Jack. (Caporal). "Credit and debit card market share by network and issuer." *Motley Fool.* January 24, 2024; Capital One-Discover Investor Presentation. 2024 at 9.

*ANTICOMPETITIVE EFFECTS OF THE PROPOSED CAPITAL ONE-DISCOVER MERGER*

firms holding more than half of the outstanding loans and the merger would steeply increase concentration. In addition, the merger would create a highly-concentrated market for non-prime credit card lending that would be presumed to substantially lessen competition under the 2023 Merger Guidelines. The resulting increase in consolidation would be part of a larger trend towards concentrated credit card lending markets that has disadvantaged consumers.

The proposed merger would entrench market power and make it possible for the combined Capital One-Discover firm to extend its reach and expand its profits at the expense of customers. Cardholders are closer to captive consumers than consumers with frictionless switching who could easily move to other credit card lenders, so the merged firm would have the ability and incentive to impose small but significant increases on prices that incumbent customers would have little ability to easily avoid.

The credit card lending industry operates as a cartel-like oligopoly with firms (mostly banks lending on brand name credit cards like Visa and Mastercard) with sustained high prices and profits in excess of what would be sustained in competitive markets. Moreover, it appears that the small number of dominant firms can and do mirror and follow one another's pricing, with the largest firms, including Capital One, charging among the highest interest rates and fees.

### *Merger between general-purpose credit card issuers with outstanding loans:*

The Capital One-Discover merger is a horizontal merger between national, general purpose credit card issuers (or lenders). Consumers use credit cards to make secure, convenient purchases that are effectively short-term loans. Many transactions require a credit card, such as car rentals, airplane tickets, or hotel reservations and many families use credit cards to finance larger purchases or as loans during financial emergencies, such as car repair. There are effectively no substitutes for general purpose credit cards. Private label credit cards can only be used at the affiliated merchants, debit cards or cash cannot be used to finance purchases that exceed funds availability, other fringe finance firms like payday lenders offer credit on even more disadvantageous terms than the high-interest rate and high-fee credit card products.

Credit card lenders set the availability, prices, and terms of credit cards based on consumers' credit scores. Consumers with higher credit scores can qualify for higher credit limits and lower interest rates, and consumers with non-prime credit scores (including near-prime and subprime scores) typically qualify for smaller credit lines and higher interest rate prices.[28]

The appropriate product market definition for the proposed merger is for national, general-purpose outstanding credit cards loans and the submarket of these loans to

---

[28] This analysis uses the definitions of prime, near-prime, and subprime credit scores from the CFPB and it aggregates near-prime and subprime into a non-prime category. The higher, prime scores are over 660, near-prime scores are between 620 and 659, and subprime scores are 619 and below and these definitions are used throughout this analysis. CFPB Consumer Credit Card Market, 2023 at 12.

consumers with non-prime credit scores. More than four-fifths of credit card purchases become revolving debt that is added to cardholders outstanding balance (only 18 percent of purchases are paid off during the statement period).[29] The Federal Reserve has determined that the appropriate market is for the outstanding credit card loan balances (not the volume of purchases or transactions) for national, general-purpose credit cards.[30]

General purpose credit cards are the basic branded credit cards (typically co-branded between a credit card network, like Visa, and bank underwriter, like JPMorgan Chase) that can be used to finance purchases. Private label store cards are not included in this definition because they are not near product substitutes, since private label cards can only be used at the affiliated merchant (such as a gas station) but not for general purchases. Three-quarters of U.S. adults — about 180 million people — had at least one general purpose credit card account at the end of 2021.[31]

### A. Merger would worsen cardholder lock-in — captive consumers cannot easily switch in the face of price hikes

Capital One deceptively contends that consumers would be insulated from the undue exercise of market power because of the "ease with which consumers can switch."[32] Credit card loans are different than other consumer products because consumers cannot merely switch to a comparable substitute to avoid small significant non-transitory price increases.[33] Unlike most products and services, credit card loans are not open to all consumers. The credit card lender requires an application process that gives the issuer the right to approve or reject the application.

There are search costs for consumers; it can be time consuming and complicated to compare complex credit card terms.[34] Applying for a new credit card can lower consumer credit scores by 5 points per application.[35] And the search can often be fruitless, especially for consumers with lower incomes and lower credit scores. More than half (56 percent) of general-purpose credit card applications are rejected.[36] The rejection rates are higher for applicants with near-prime credit scores (59 percent of applications are rejected) and those with subprime credit scores (83 percent are

---

[29] *Ibid.* at 33.

[30] Federal Reserve System. First Chicago Corp. Order Approving an Acquisition of a Bank. *Federal Reserve Bulletin.* July 1987 at 601; Federal Reserve System. Order Approving the Merger of Bank Holding Companies. Bank of America Corporation. March 22, 2005 at 10.

[31] CFPB Consumer Credit Card Market. 2023 at 15.

[32] Capital One, NA. (Capital One OCC Application). Application to the Office of the Comptroller of the Currency (OCC) for prior approval to merge with Discover Bank. Public Exhibits Volume. March 20, 2024. Exhibit A. Form of Bank. Merger Agreement. February 19, 2024 at Exhibit 21. Memorandum on Competitive Considerations at 1 (388 in the application).

[33] The 2023 Merger Guidelines recognize that a hypothetical monopolist could impose small significant non-transitory price increases or other worsening terms that would harm consumers. DOJ/FTC 2023 Merger Guidelines. 2023 at 41.

[34] Ausubel, Lawrence M. (Ausubel). "The failure of completion in the credit card market." *American Economic Review.* Vol 81, No 1. March 1991 at 69.

[35] White, Alexandria. "Here's how having multiple credit cards affects your credit score." *CNBC.* November 14, 2023.

[36] CFPB Consumer Credit Card Market. 2023 at 80.

*ANTICOMPETITIVE EFFECTS OF THE PROPOSED CAPITAL ONE-DISCOVER MERGER*

rejected).[37] A 2020 study found that lower income consumers were less likely to get approved for credit cards and more likely to receive lower credit limits and higher interest rates.[38]

Even if a cardholder could secure a new credit card, switching can have negative economic costs that can exceed the benefits of avoiding price increases. Switching outstanding balances to a new card typically incurs a balance transfer fee of between 3 percent and 5 percent (cards without a balance transfer fee that have a zero APR teaser rate are rare).[39] It could cost $250 for consumers with a $5,000 credit card balance. Closing accounts can also have negative impacts on credit scores — as Capital One itself warns on its website.[40] First, closing a credit account can increase a consumer's credit utilization ratio (the ratio of outstanding balance to total credit limit) that makes up about one-third of credit scores.[41] Second, closing accounts can shorten consumers' account history which amounts to about 15 percent of credit scores.[42] Third, cardholders, especially those with subprime credit scores, can forfeit their amassed rewards when they close their accounts.[43]

The Capital One-Discover merger would leave cardholders vulnerable to small significant non-transitory increases in price because their ability to switch to alternative credit cards is constrained by frictions in application, cost, and economic impact to their credit scores. This leaves cardholders essentially captive consumers to Capital One price increases, especially for cardholders with non-prime credit scores and/or significant outstanding balances. Capital One is silent on how it would treat Discover cardholders after the merger, but it would have the ability and incentive to increase the interest rates on the 50 million Discover cardholders. In that way, the merger is likely to swiftly impact Discover credit cardholders who currently have interest rates that are more than 2 percentage points lower on average than the Capital One cards for cardholders of comparable credit scores. Increasing Discover cardholders' rates to Capital One levels would amount to a nearly 9 percent price hike on cardholders with near-prime credit scores and a 13 percent increase on those with prime scores (see Table 1).[44]

---

[37] *Ibid.* at 81.

[38] Raveendranathan, Gajendran. McMaster University. "Revolving Credit Lines and Targeted Search." February 24, 2020.

[39] Crail, Chauncey. "What is a balance transfer fee?" *Forbes.* January 2, 2024.

[40] Capital One. "Does closing a credit card hurt your credit score?" Accessed March 2024.

[41] Credit scores attribute more points to lower credit utilization ratios. If a consumer has 2 credit card accounts each with a $5,000 credit limit and each with a $2,000 balance, the credit utilization would be 40 percent. If they closed one account and shifted the balance, the $4,000 balance on a $5,000 credit limit would raise the credit utilization ratio to 80 percent. Consumers with lower credit scores may only be offered accounts with lower credit limits, which would raise their credit utilization ratios. Taylor, Mia. "Is it bad to close a credit card? Yes, and here are 4 reasons why." *Fortune.* March 18, 2024.

[42] Credit account history typically considers the accounts with the longest and shortest duration and calculates an average. If consumers have only a single credit card account, closing an account can dramatically lower the credit account history component of their credit score. Black, Michelle. "Does applying for a credit card hurt your credit score?" *Forbes.* September 19, 2023.

[43] CFPB Consumer Credit Card Market. 2023 at 102.

[44] AFREF analysis of average interest rates of all general-purpose credit cards. CFPB. (CFBP Credit Card Survey) "Terms of Credit Card Plans Survey Results." November 2023.

*APRIL 2024*

| Table 1. Comparison of Capital One and Discover credit card interest rates (average purchase APR) | | | | |
|---|---|---|---|---|
| | **Near-prime** | **Prime** | **Average minimum** | **Average maximum** |
| Capital One | 28.65% | 23.90% | 18.48% | 29.34% |
| Discover | 26.37% | 21.07% | 14.21% | 24.49% |
| Percentage point difference | 2.3% | 2.8% | 4.3% | 4.8% |
| Added cost for cardholder with av. balance and av. minimum payment | $86 | $125 | $139 | $101 |
| Percent difference | 8.7% | 13.4% | 30.1% | 19.8% |
| Source: AFREF analysis of CFPB credit card survey data. | | | | |

Capital One could increase revenues by $2.8 billion (most of it pure profit) by increasing the Discover cardholders interest rates to Capital One's average interest rates (Discover has $82 billion in outstanding loans to cardholders with prime credit scores and $20 billion in loans to those with near-prime scores).[45] With such an increase, the average cardholder paying the average minimum payment would take a month longer to pay off an existing balance and borrowers with near-prime scores would pay $86 dollars in added interest payments (to pay off an average balance of $1,960 and average minimum payment of $96) and borrowers with prime credit scores would pay an additional $125 in interest payments (to pay off an average balance of $2,588 and average minimum payments of $118).[46]

Consumers would face difficulty avoiding price hikes because of the barriers to or high costs of switching because the proposed merger would increase concentration in credit card markets. There would be one fewer prominent national brands and customers that might have considered Discover and Capital One as alternatives — especially consumers with non-prime credit scores — would have fewer choices. Moreover, the increased likelihood of coordination would give the merged firm the market power to raise prices or lower quality.

## B. Merger would increase consolidation in already concentrated credit card market

The proposed merger significantly increases concentration in an already concentrated market and creates the largest general purpose credit card lender. Capital One-Discover would hold 22 percent of all outstanding general purpose credit card loans and would be twice as big as the then number four Bank of America (with 9.1 percent of all credit card loans) and nearly five times larger than the then number 8 Wells Fargo (with 4.6 percent). Although more than 4,000 banks offer credit cards, only the 15 largest institutions hold more than one percent of the

---

[45] Discover SEC Form 10-K. 2023 at 64 and 102.
[46] AFREF calculation based on CFPB cardholder averages and Discover credit card interest rate calculator. CFPB Consumer Credit Card Market. 2023 at 35 and 41.

*ANTICOMPETITIVE EFFECTS OF THE PROPOSED CAPITAL ONE-DISCOVER MERGER*

outstanding credit card loans.[47] As CFPB Director Chopra observed, bank mergers "between banks that compete nationally in a concentrated consumer credit market could substantially lessen competition."[48]

The credit card issuer market has become more concentrated because of economies of scale for mass marketing, automated underwriting, and servicing.[49] But mergers have played an important role in consolidation. In 2001, the Federal Reserve reported that "Most of the larger issuers have grown by acquiring credit card portfolios from smaller issuers or by merging with other firms."[50] A 2023 white paper by an Office of the Comptroller of the Currency researcher found that the "major consolidation" in the banking industry during the late 1990s and early 2000s contributed to the "rise in the concentration of the credit card market."[51] For example, Capital One bought HSBC Bank Nevada in 2012, acquiring $30 billion in credit card loan assets.[52] This merger alone amounts to nearly 30 percent of Capital One's current $147 billion in credit card loans in real, inflation-adjusted dollars.



Fig. 1: Credit Card Four-Firm Concentration (based on outstanding balances)

Source: AFREF analysis of FDIC Call Reports, FRB NY. *2024 post-merger

The credit card lending industry demonstrates what the merger guidelines characterize as a "recent history and likely trajectory of an industry" concentration that "present a threat to competition" and "may suggest a greater risk of harm."[53] The credit card lending industry has gotten considerably more concentrated in the past two decades (see Figure 1).[54] Prior to the financial crisis, the top four general purpose credit card lenders held less than a third (31.7 percent) of the outstanding credit card debt. Concentration increased sharply

[47] CFPB Consumer Credit Card Market. 2023 at 18.
[48] Chopra, Rohit. Consumer Financial Protection Bureau Director. [Speech]. "Prepared remarks of CFPB Director Rohit Chopra at the Peterson Institute for International Economics Event on Revitalizing Bank Merger Review." March 21, 2024.
[49] Wilmarth, Arthur E Jr. Testimony before Subcommittee on Financial Institutions and Consumer Credit. Committee on Financial Services. U.S. House of Representatives. "Credit Card Practices: Current Consumer and Regulatory Issues." April 26, 2007 at 1 to 2.
[50] Federal Reserve Board. "The Profitability of Credit Card Operations of Depository Institutions." June 2001 at 4.
[51] Grodzicki, Daniel. (Grodzicki). OCC. "The Evolution of Competition in the Credit Card Market." Working Paper. June 28, 2023 at 7.
[52] OCC. Application by Capital One, NA to Acquire HSBC Bank of Nevada. 2011-NE-02-0028 and -0029. CRA Decision No. 149. April 2012 at 1.
[53] DOJ/FTC 2023 Merger Guidelines. 2023 at 22.
[54] This analysis uses the outstanding credit card loans from the FDIC call reports and the total outstanding general purpose credit card loans from the Federal Reserve Bank of New York, considered the gold standard for household debt. AFREF analysis of 30 credit card lenders from FDIC Call Reports for credit card loan assets. See Appendix for full 30-firm table and detailed methodology. Total outstanding credit card loans from Federal Reserve Bank of New York. Center for Microeconomic Data. (FRB NY). Household Debt and Credit Report. Q4 2023. Credit card loans are general purpose credit card "revolving accounts for banks, bankcard companies, national credit card companies, credit unions and savings & loan associations."

after the financial crisis (when major banks absorbed failed institutions), then subsided by 2020, and resumed increasing after that. The proposed Capital One-Discover merger would increase the four-firm concentration ratio from 55.4 percent to 64.5 percent — making it about 16 percent higher than in 2020.

The proposed merger would increase concentration in already concentrated markets. The proposed merged does not worsen or create highly concentrated markets in total credit card lending that are presumptively illegal, but the increase in concentration exceeds a Herfindahl-Hirschman Index (HHI) delta of 200, demonstrating that the proposed merger significantly increases concentration in a way

| Table 2: Credit card outstanding loan market shares and concentration levels 2023 and post-merger | | | | |
|---|---|---|---|---|
| | **Total Credit Card Loans** | | **Non-Prime Credit Card Loans** | |
| Issuer[55] | **Market Share** | **Rank** | **Market Share** | **Rank** |
| JPMorgan Chase | 18.7% | 1 | 13.4% | 3 |
| Citibank | 14.6% | 2 | 15.3% | 2 |
| Capital One | 13.1% | 3 | 21.5% | 1 |
| Discover | 9.1% | 4 | 9.1% | 5 |
| Bank of America | 9.1% | 5 | 7.7% | 6 |
| American Express | 8.7% | 6 | 0.0% | 10 |
| Synchrony | 8.6% | 7 | 12.3% | 4 |
| Wells Fargo | 4.6% | 8 | 4.6% | 8 |
| Barclays | 2.8% | 9 | 2.8% | 9 |
| Navy Federal Credit Union | 2.6% | 10 | 5.7% | 7 |
| *Capital One + Discover* | *22.1%* | *1* | *30.6%* | *1* |
| Four-Firm Concentration Ratio | Pre-merger | 55.4% | | 62.5% | |
| | Post-merger | 64.5% | | 71.6% | |
| HHI | Pre-merger | 1,100 | | 1,236 | |
| | Post-merger | 1,337 | | 1,626 | |
| | Δ | 237 | | 390 | |
| Source: 2023 Securities and Exchange Commission filings, FDIC call reports, and Federal Reserve Bank of New York household debt data. | | | | |

that indicates the merger may likely substantially reduce competition (see Table 2).[56] The merged Capital One-Discover firm would hold more than one-fifth of total credit card loans and nearly one-third of non-prime credit card loans. The Supreme Court held in the Philadelphia National Bank case that "the fact that a merger results in a less-than 30 percent market share, or in a less substantial increase in concentration than in the [PNB] case, does not raise an inference that the merger is *not* violative" of the Clayton Act.[57]

---

[55] Total outstanding general purpose credit card loans from FRB NY. Q4 2023. Issuer loans based on credit card loans carried as assets on Securities and Exchange Commission filings or FDIC call reports. Non-prime market based on issuers' disclosure of higher-risk loans (typically reported as under 660 credit score, although some report under 680 or under 650). Eighteen of the 30 issuers reported non-prime lending breakdown on their SEC reports and the total reported non-prime lending from these 18 firms was divided into their total lending to determine an average of 19 percent of credit card loans to consumers with non-prime credit scores; this average was applied to the total credit card loans of issuers that did not report breakdowns and the FRB NY total loans to get individual issuer non-prime credit card lending and market size. See appendix for full 30-firm table.

[56] DOJ/FTC 2023 Merger Guidelines. 2023 at 5.

[57] U.S. v. PNB. 1963 at note 41 at 364 to 365.

*ANTICOMPETITIVE EFFECTS OF THE PROPOSED CAPITAL ONE-DISCOVER MERGER*

### C. Merger would create concentrated non-prime credit card market, disproportionately harming Black, Latine, and lower-income consumers

The proposed merger would have especially damaging effects on consumers with non-prime credit scores. It would significantly increase a concentrated market, raising the HHI by nearly 440 points to over 1,600, and the merged firm would hold 30.6 percent of the outstanding loans to borrowers with non-prime credit scores. The steep increase in concentration combined with a market share over 30 percent are factors that are "presumed to lessen competition or tend to create a monopoly" in violation of the Clayton Act.[58]

The merger would also eliminate the current Capital One-Discover rivalry for customers with non-prime credit scores, and the erasure of "existing competition between the merging firms [that] can demonstrate that a merger threatens competitive harm independent from an analysis of market shares," according to the merger guidelines[59] Consumers with non-prime credit scores — who are disproportionately Black and Latine — have fewer credit card options, have more difficulty securing credit cards, and are more susceptible to receiving higher fees and penalty interest rates. The merger would substantially lessen competition or tend to create a monopoly in the non-prime credit card lending market and have a negative impact on economically vulnerable consumers.

The merger would create a non-prime credit card lender with nearly one-third of the market and with a market share twice as large as the number 2, 3, and 4 lenders (Citibank, Chase, and Synchrony). The Supreme Court noted in the PNB case that "a merger which produces a firm controlling an undue percentage share of the relevant market, and results in a significant increase in the concentration of firms in that market, is so inherently likely to lessen competition substantially that it must be enjoined in the absence of evidence clearly showing that the merger is not likely to have such anticompetitive effects."[60]

The non-prime credit card market is a discrete subset of the total credit card lending market where the interest rates and terms are determined based on consumers' lower credit score. These consumers do not qualify for the better terms, higher rewards, or lower interest rates offered to consumers with prime or better credit scores. In 2022, there were 31 million consumers with non-prime credit scores that had at least one general purpose credit card (15 million people with near-prime scores between 620 and 659 and 14 million people with subprime scores below 620).[61] These customers with non-prime credit card scores amount to about 28 percent of general-purpose

---

[58] [DOJ/FTC 2023 Merger Guidelines](). 2023 at 5 to 6.
[59] *Ibid.* at 7.
[60] [U.S. v. PNB](). 1963 at 363.
[61] [CFPB Consumer Credit Card Market](). 2023 at 16.

cardholders.[62] Since credit scores are dynamic, consumers with near-prime credit scores can easily have their scores downgraded to subprime related to their credit card account or *other* accounts for late payments, increased credit utilization, applying for other loans, or other events that can negatively impact credit scores.

Credit scoring models provide algorithmic, modeled assessments of people's creditworthiness and estimate potential borrowers' ability to repay loans. These credit scores are a critical component of determining who is approved for credit, but credit scoring often replicates the systemic racial injustices of the economy and financial system because the Black and Latine consumers with lower incomes, more medical debt, lower homeownership rates, fewer assets, and less credit history are deemed less creditworthy.[63] Black and Latine consumers who have credit scores tend to have lower average credit scores than white consumers (8 percent and 5 percent lower, respectively).[64] A 2022 Urban Institute study found that there were far more people with subprime credit scores in Black, indigenous, and Latine communities than in white communities (41 percent, 43 percent, 29 percent, and 17 percent, respectively).[65]

Concentrated credit card lending markets especially disadvantage lower-income and disproportionately Black and Latine consumers because of the stark credit score disparities that determine their access and terms for credit card loans. The 2020 National Bureau of Economic Research paper observed that "the welfare costs of monopoly in the U.S. credit card industry are large and disproportionately borne by low-income households."[66] A 2013 Arizona Law Review article stated that "the credit card market is noncompetitive for low-income users who uniformly receive offers of cards with disadvantageous terms."[67]

The merger would create a full-service banking, digital banking, and credit card company for customers with near-prime and subprime credit scores that are largely ignored by major banks.[68] Capital One and Discover are major credit card lenders to consumers with non-prime credit, with a combined $67 billion in loans to consumers with non-prime credit scores in 2023.[69] These loans to non-prime borrowers

---

[62] This analysis discuses consumers with prime credit scores of 660 and above, but many sources also delineate consumers with super-prime credit scores of 720 and above. Government Accountability Office (GAO). "Credit Cards: Pandemic Assistance Likely Helped Reduce Balances, and Credit Terms Varied Among Demographic Groups." GAO-23-105269. September 2023 at 11.

[63] National Consumer Law Center. "Past Imperfect: How Credit Scores and Other Analytics 'Bake In' and Perpetuate Past Discrimination." May 3, 2016.

[64] Sandberg, Erica. "How race affects your credit score." *US News and World Report*. August 9, 2022.

[65] Urban Institute. "Credit Health During the COVID-19 Pandemic." March 8, 2022.

[66] Herkenhoff, Kyle F. and Gajendran Raveendranathan. (Herkenhoff and Raveendranathan). National Bureau of Economic Research. "Who Bears the Welfare Costs of Monopoly? The Case of the Credit Card Industry." NBER Working Paper No. 26604. May 2021 at 43.

[67] Freeman, Andrea. "Payback: A structural analysis of the credit card problem." *Arizona Law Review*. Vol. 55, No. 151. 2013 at 163.

[68] "Capital One/Discover combo could create financial ecosystem for paycheck-to-paycheck customers." *PYMNTS*. February 20, 2024.

[69] Capital One SEC Form 10-K. 2023 at 94, 90, 91, Discover SEC Form 10-K. 2023 at 64 and 102.

*ANTICOMPETITIVE EFFECTS OF THE PROPOSED CAPITAL ONE-DISCOVER MERGER*

represent 32 percent of Capital One's and 20 percent of Discover's outstanding credit card loans.[70] The merger would join Capital One's customer base that is generally less affluent than that of the major premium credit card issuers (such as Chase, Citibank, and American Express) with Discover's customers that *Forbes* refers to as "more middle market."[71] Discover had always targeted middle-income consumers since its inception as the Sears store card.[72] Both issuers' customer base is heavily weighted to households that are establishing or rebuilding their credit scores to develop good credit profiles.[73]

Capital One and Discover are pursuing and competing for the same consumers with non-prime credit scores and the merger would eliminate an important option for consumers with constrained credit card choices. Consumers with non-prime credit scores are likely choosing between Capital One and Discover products. The *Bankrate* and WalletHub websites list Capital One and Discover as good alternatives for one another for those with bad credit, fair credit, and to build credit.[74] Capital One and Discover were two of the biggest marketers to consumers with near-prime and subprime credit scores, sending more than 860,000 pieces of direct mail between 2019 and the first quarter of 2024 — about one third of all credit card mailings.[75] The two companies were the only two top 10 credit card lenders among the top 5 direct mail credit card marketers.[76]

The merger would eliminate the rivalry for consumers with non-prime credit scores and significantly increase concentration in the non-prime credit card lending market. Consumers with non-prime scores — current cardholders of the merged company and those seeking credit cards — would have fewer choices and would likely face higher prices. Capital One already charges 2 percentage points higher interest rates to consumers with near-prime credit scores than Discover. Non-prime customers would be vulnerable to price hikes because it is harder for these consumers to find and secure a credit card account (issuers reject three-fifths of applications from consumers with near-prime scores and four-fifths of consumers with subprime scores).[77] The merged firm would become the dominant credit card issuer to consumers with non-prime credit scores and would have the market power to impose higher prices and fees than would be possible in a less concentrated market.

---

[70] *Ibid.*
[71] Sweet, Ken. "Capital One to Buy Discover for $35 Billion in Deal Combining Major U.S. Credit Card Companies." *Associated Press.* February 16, 2024; Mason, Emily. (Mason). "Why Capital One's $35 billion Discover takeover will be a profit game changer." *Forbes.* February 22, 2024.
[72] Fitzgerald, Kate. (Fitzgerald). "5 key drivers of the Capital One-Discover merger." *American Banker.* February 20, 2024.
[73] Huffman. 2024.
[74] Davis, India. "Best credit cards for bad credit in April 2024." *Bankrate.* April 3, 2024; Thomas, Reena. "Best credit cards for fair/average credit in April 2024." *Bankrate.* April 1, 2024; Kiernan, John. "Best credit cards to build credit." *WalletHub.* April 5, 2024; Kiernan, John. "Best credit cards for bad credit." *WalletHub.* April 5, 2024.
[75] AFREF analysis of Compremedia. 2024 Ominchannel Marketing Trends. Credit card direct mail.
[76] Botella, Elena. "A Capital One-Discover merger could raise credit card rates." *Forbes* March 16, 2024.
[77] CFPB Consumer Credit Card Market. 2023 at 81.

### D.  Merger would worsen oligopolistic tendencies to extract excess profits and impose coordinated prices

The proposed merger would create a more concentrated national credit card issuer market that would enhance the ability of dominant firms to pursue coordinated market strategies to impose high — and similar — prices and capture excess profits. The credit card industry has consistently higher profits than other banking industry business lines and the largest firms appear to charge higher and tacitly coordinated prices that suggests an oligopolistic and anticompetitive market with few dominant players extracting excess profits. The former Citibank counsel for credit cards stated that the industry operates as "a cartel."[78]

The small number of dominant credit card issuers with the scale to aggressively advertise nationally creates "market conditions [that] are susceptible to coordinated interaction" identified in the 2023 merger guidelines.[79] The merger would exacerbate the coordinated market effects by eliminating a maverick (Discover offers credit cards at significantly lower interest rates, see below) that "increases the susceptibility to coordination," as the market becomes significantly more concentrated in a market where prices and terms are "easily observed by [its] rivals."[80]

The consistently high profits of the credit card lending business dominated by a few firms demonstrates one element of coordinated markets. The merger guidelines note that coordination is "more likely to occur when participants stand to gain more from successful coordination" and that this is even more profitable when consumers cannot substitute outside the market in the face of higher prices.[81] Professor Arthur Wilmarth testified that the high credit card profits, high levels of concentration, and high interest rate and fee pricing all "indicate that the credit card industry operates as an oligopoly rather than a competitive industry."[82] The Government Accountability Office reported that credit card lenders have had stable profits that have been the most profitable in the banking industry.[83] According to the Federal Reserve, credit card revenues and profits have "almost always been higher" than other bank business lines and credit card banks return on assets was nearly five times higher than other banks in 2021.[84]

---

[78] McDonald, Duncan A. (McDoonald). "Card industry questions Congress needs to ask." American Banker. March 23, 2007.
[79] DOJ/FTC 2023 Merger Guidelines. 2023 at 8.
[80] Although credit card issuers offer a range of cards, most of the major issuers offer descriptions of their card products on their websites. Citibank. View All Cards. JPMorgan Chase. All Credit Cards. Bank of America. Compare and Find the Credit Card That's Right for You. Capital One. Compare All Cards. Accessed April 2024; DOJ/FTC 2023 Merger Guidelines. 2023 at 9.
[81] DOJ/FTC 2023 Merger Guidelines. 2023 at 10.
[82] Wilmarth. 2007 at 4.
[83] GAO. "Credit Cards: Increased Complexity in Rates and Fees Heightens Need for More Effective Disclosures to Consumers." GAO-06-929. September 2006 at 8.
[84] Federal Reserve Board. "Profitability of Credit Card Operations of Depository Institutions." July 2022 at 4.

**Proposed merger could entrench coordinated pricing strategies that harm consumers:** The credit card issuing industry has long exhibited behavior that amounts to the kind of "express or tacit coordination to lessen competition [that] is highly informative to the market's susceptibility to coordination" described in the 2023 merger guidelines.[85] A Government Accountability Office credit card industry study found that "the structural characteristics of the credit card industry are favorable toward tacit coordination among card issuers," including through stable, price-matching strategies that do not vary with the cost of providing the loans.[86] The Federal Reserve Bank of Kansas City paper on credit cards concluded that the oligopolistic credit card market could "sustain the monopoly price without explicit collusion" because the "threat of a vigorous price war would be sufficient to deter the temptation to cut prices. Hence, the oligopolists might be able to collude in a purely noncooperative manner and the monopoly price is the most likely outcome."[87]

The coordinated high interest rates charged by the dominant credit card issuers are significantly disconnected from the cost of providing credit card loans to consumers (the prevailing interest rate environment). Credit card issuers tend to rapidly increase interest rates when the interest rates rise but are slow to lower rates when interest rates fall, meaning consumers are paying more and banks are capturing more profits. This sticky pricing is indicative of the exercise of market power, because in a more competitive market, rivals would offer lower rates to capture customers from those charging higher prices. A 1990 *American Economic Review* study found that "credit card interest rates were highly sticky" and remained steady irrespective of the prevailing interest rates.[88] A 1994 General Accounting Office reported "several issuers charged the same annual interest rate of 19.8 percent for several years despite decreasing funding costs."[89]

The extractive pricing that is disconnected from the costs of providing credit card loans has persisted with quickly rising credit card interest rates when interest rates rise and slower and lower declines when interest rates fall (see Figure 2).[90] A 2023 paper by an Office of the Comptroller of the Currency researcher found that although sticky credit card pricing abated somewhat after the mid-1990s, large credit card lenders have continued to "set similar non-introductory prices in order to hold on to incumbent customers."[91] The oligopolistic market has enabled firms to impose price markups and extract excess profits. A 2020 National Bureau of Economic Research paper found that the limited competition allowed credit card lenders to

---

[85] DOJ/FTC 2023 Merger Guidelines. 2023 at 9.
[86] GAO. (GAO 1994). "U.S. Credit Card Industry: Competitive Developments Need to be Closely Monitored." GAO/GGD-94-23. April 1994 at 26.
[87] Wang. 2006 at 22 to 23.
[88] Ausubel. 1991 at 53.
[89] GAO. 1994 at 4.
[90] Federal Reserve Board. Commercial Bank Interest Rate on Credit Card Plans, Accounts Assessed Interest. G.19 Consumer Credit; Federal Reserve Board. Federal Funds Effective Rate. H.15 Selected Interest Rates. Accessed March 2024.
[91] Grodzicki. 2023 at 11.



charge interest rates that were 8 percentage points above the Moody's AAA average rate from 1974 to 2016. This amounted to a markup of over 44 percent.[92] The CFPB found that the lack of competition in interest rates contributed to the credit card industry widening the margin between credit card interest rates and the prime rate (increasing it by 2 percentage points from 2015 to 2022).[93]

Bigger credit card issuers appear to use their market power to impose higher interest rates and fees on consumers and the prices offered by the dominant firms tend to cluster together. As the former Citibank credit card counsel observed, "bank card pricing is the inverse of a competitive industry."[94] In 2023, the CFPB found that the biggest credit card issuers had among the highest interest rates and half offered cards with interest rates over 30 percent.[95] The largest credit card issuers also charged the highest late fees in a narrow band between $35 and $40 in 2020.[96]

The interest rates charged by the biggest credit card issuers cluster together. A 2023 paper found that larger credit card lenders were more likely to offer low or zero introductory teaser rates to entice new customers,[97] suggestive of bigger credit card lenders using their market power to offer less-profitable terms for the short term to capture market share. The top four credit card lenders (JPMorgan Chase, Citibank,

---

[92] Herkenhoff and Raveendranathan. 2021 at 14 to 15.
[93] CFPB Consumer Credit Card Market. 2023 at 54.
[94] McDonald 2007.
[95] CFPB. "Credit Card Data: Small Issuers Offer Lower Rates." February 16, 2024.
[96] CFPB. "Credit Card Late Fees." March 2022 at 14 to 15.
[97] Grodzicki. 2023 at 11.

Capital One, and Discover) that hold more than half of 2023 outstanding credit card debt have median purchase interest rates for consumers with near-prime credit scores and median maximum purchase interest rates that are tightly grouped and suggest tacit price coordination.[98] There is a less than 2-percentage point spread between the highest and lowest median purchase interest rates of the top four credit card companies (see Figure 3).[99] The interest rates offered by the biggest issuers were over 15 percent higher than the 2023 average interest rate of 22.8 percent.[100]



Fig. 3: Four largest credit card issuers' median purchase APR

Source: AFREF analysis of CFPB survey data

The proposed merger would calcify these coordinated high-price trends. In 2022, credit card issuers charged consumers over $100 billion in interest and over $25 billion in fees.[101] Credit card fees were 20 percent higher than in 2020 and interest charges rose as interest rates increased.[102] Cardholders with revolving accounts pay nearly all (94 percent) of the interest charges and three-quarters of the fees assessed by credit card companies.[103] The higher consumer credit card debt can compromise household finances and economic stability of families and these negative impacts are disproportionately felt by Black and Latine families, lower-income families, and consumers with lower credit scores.

## IV.    Merger combines hundreds of millions of cardholders' data, reducing the data security and privacy of Discover customers

The Capital One acquisition of Discover would reduce the quality of product offerings and undermine the 300 million Discover customers' privacy and data

---

[98] These two metrics are most appropriate for demonstrating coordinated pricing strategies. Consumers with subprime credit cards are price-takers who have difficulty securing credit cards on any terms allowing issuer to impose prices that need not be coordinated to secure customers. Issuers compete for consumers with prime credit scores on dimensions beyond price, especially various rewards programs such as cash-back, travel points, and airline miles. Issuers compete more directly on price alone for consumers with near-prime scores and are more likely to follow or match the maximum purchase interest rates to prevent consumers from switching as they approach the highest pricing levels. Nonetheless, the median purchase interest rate groupings are similar but broader for consumers with subprime and prime credit scores.

[99] AFREF analysis of credit card survey data. CFPB Credit Card Survey 2023.

[100] Martinez, Dan and Margaret Seikel. CFPB. "Credit card interest rate margins at all-time high." February 22, 2024.

[101] CFPB Consumer Credit Card Market. 2023 at 52 and 62 to 63.

[102] *Ibid.*

[103] *Ibid.* at 48 to 49.

protection by substantially enhancing Capital One's ability and incentive to exploit customer data. Capital One is purchasing not just Discover's credit card loans, payments networks, and bank deposits, it is also purchasing the asset that is Discover's considerable trove of customer transaction and personal data. Capital One aggressively harvests, shares, and aggregates data and deploys advanced data analytics in its business but its privacy protections are considerably weaker than those of Discover and it exposed its customers to one of the biggest data breaches in the financial system.

The merger would enhance Capital One's market power over data and degrade the quality of product offerings by weakening the security, and privacy of personal data of Discover customers. Capital One touted the Discover merger for expanding its "technology and data ecosystem" to build a data footprint.[104] The merger application stated the transaction would grant Capital One "differentiated information and data on [Discover's] customers' credit card use" and "access to transactional data that can be used to improve the Capital One Shopping and Capital One Travel" programs.[105]

Mergers that reduce competition or tend to create monopolies in data and data analytics can reduce the quality of service by compromising privacy or reducing the security of customers' personal information. President Biden's executive order on competition states that it is the administration's policy "to enforce the antitrust laws to meet the challenges posed by new industries and technologies, including [...] the aggregation of data."[106]

The 2023 Justice Department complaint against Google noted the company "intentionally exploited its massive trove of user data to further entrench its monopoly" in ways that that eroded the privacy of users to further its own economic interest.[107] In 2022, the U.S. District Court sustained the FTC's contention that "the lack of 'meaningful competition' has allowed Facebook to 'provide lower levels of service quality on privacy and data protection than it would have to provide in a competitive market.'"[108] The European Commission's decision in the Google-Fitbit merger found it would grant "control over an important asset, the Fitbit data, that would further strengthen Google's dominance."[109]

Mergers can combine and concentrate large pools of personal data and enable the merged party to more fully exploit that data for commercial purposes while risking

---

[104] Capital One press release. 2024.
[105] Capital One OCC Application. 2024 at Exhibit 21. Memorandum on Competitive Considerations at 18 (405 in the application).
[106] President Biden. Exec. Order 14036 §1. Executive Order on Promoting Competition in the American Economy. July 9, 2021.
[107] United States of America et al. v. Google LLC. Complaint in the U.S. District Court for the Eastern District of Virginia. Case 1:23-cv-00108. January 24, 2023 at 13 to 14 and 39.
[108] FTC v. Facebook Inc. Memorandum Opinion. U.S. District Court for the District of Columbia. No 1:20-cv-03590-JEB. January 11, 2022 at 30 to 31.
[109] European Commission. Directorate-General for Competition. Commission Decision. Case M.9660 – Google/Fitbit. December 17, 2020 at 98.

the privacy and security of their customers personal data.[110] Public interest organization Free Press argued that the merger of Sprint and T-Mobile would eliminate T-Mobile's incentive to maintain its privacy-protecting alternative role in the market and because the merger joined two carriers that had higher proportions of lower-income, Black, and Latine customers, the merger would disproportionately harm disadvantaged consumers on price and privacy quality.[111]

**Credit card firms collect and exploit personal data:** Banks and credit card firms amass considerable troves of personal data that they use to process transactions but also to share or sell to third-party data brokers and marketing firms that can exploit their customers personal information.  Banks and credit card companies collect reams of personal data to establish accounts and process loan and credit card applications (that includes name, date of birth, social security number, address, income, assets, credit history and score, employment and employment history, transaction data, etc.) but also collect supplementary information from interaction with institutions' websites or mobile apps (including social media activity, internet browsing, internet protocol address, device or computer information, etc.) to compile customer profiles for marketing purpose.[112] The former Citibank counsel for credit cards summarized that:

> No other industry in the world knows consumers and their transaction behavior better than the bank card industry. It has turned the analysis of consumers into a science rivaling the studies of DNA or the launching of the Discovery spaceship into orbit. The mathematics of virtually everything consumers do is stored, updated, categorized, churned, scored, tested, valued, and compared from every possible angle in hundreds of the most powerful computers and by among the most creative minds anywhere. In the past 10 years alone, the transactions of 200 million Americans have been reviewed in trillions of different ways.[113]

Credit card companies share or sell their data to advertisers and data brokers who can customize marketing materials.  The opportunities to collect consumer transaction data from lower-wage households — like the large share of Capital One and Discover customers with non-prime credit scores —is far more limited and thus more valuable to data brokers.[114] Credit card companies are selling anonymized and aggregated credit card transaction data to digital advertisers that in turn can target consumers based on zip code.[115] In 2018, Mastercard sold Google a "stockpile" of

[110] Alexander, Laura. American Antitrust Institute. "Privacy and Antitrust at the Crossroads of Big Tech." December 16, 2021 at 17.

[111] Wood, Matt and S. Derek Turner. Free Press. "The T-Mobile/Sprint merger is bad news. Here's why." May 1, 2018.

[112] GAO. "Consumer Privacy: Better Disclosures Needed on Information Sharing by Banks and Credit Unions." GAO-21-36. October 2020 at 11 to 13.

[113] McDonald 2007.

[114] Negrón, Welneida. Coworker.org. "Little Tech is Coming for Workers." 2021at 6 and 8.

[115] Edwards, Jim. "Yes, your credit card company is selling your purchase data to online advertisers." *Bloomberg Business Insider*. April 16, 2013.

*APRIL 2024*

transaction data, according to *Bloomberg*, that its advertisers could use to tailor ads and track the impact of advertising on purchases.[116] Although companies dismiss concerns about privacy, this anonymized data is not necessarily anonymous; it just does not have a person's name attached to it. A 2015 study found that a specific individual could be identified and matched to anonymized data with only four credit card transactions, so it can be easily reaggregated with other individual personal data elements.[117]

### Merger would move customers to Capital One' aggressive data harvesting and exploitation:

Capital One has a deep focus on data and data analytics. CEO Fairbank has stated "it's all about data and analytics."[118] As *Forbes* observed, "at Capital One, there's no shortage of consumer data to mine for marketing insights."[119] Capital One has purchased technology firms to strengthen its data analytics and digital marketing business, including the sales data analytics firm Bundle, the geo-located sales pitch app Bankons, and the point-of-sale card swiping device firm Sail.[120] Capital One's Chief Information Officer stated that the company pioneered "leveraging the power of data to custom tailor products to our customers" through data harvesting and statistical modeling that combined credit and demographic data to pitch a specific credit card product at a specific price and credit limit.[121] Capital One uses its curated big data to make targeted marketing pitches — for its own products or for its partner retailers — at especially timely moments, such as making recommendations to maximize rewards during online shopping sprees.[122]

This kind of data aggregation and analysis can give credit card lenders a valuable advantage over borrowers by understanding and predicting customers' willingness to pay (that is: what are the upper limits of interest rates and fees a borrower would accept) so that they can impose higher prices on consumers who are price takers, allowing the data monopolist to capture the economic surplus.[123] A former leader of Capital One's marketing efforts noted the company used big data analytics to "gain granular insights into the behavioral economics of very narrowly defined segments" that enabled the company to tailor credit card "promotions that drew on ever-expanding digital data sources."[124] The company performs over 80,000 big data marketing experiments annually.[125]

[116] Bergan, Mark and Jennifer Surane. "Google and Mastercard cut a secret deal to track retail sales." *Bloomberg*. August 30, 2018.
[117] "Credit cards offer far less privacy than you think." *CBS News*. January 15, 2015.
[118] Fitzgerald 2024.
[119] Talbot, Paul. "How Capital One develops marketing insights." *Forbes*. June 12, 2021.
[120] Buvat, Jerome and Subrahmanyam KVJ. (Buvat and KVG). Capgemini Consulting. "Doing Business, the Digital Way: How Capital One Fundamentally Disrupted the Financial Services Industry." 2014 at 2.
[121] Buvat and KVG. 2014 at 3.
[122] "Big data, better experiences: How intelligent analytics are changing the game for credit card partnerships." *Fast Company*. January 18, 2023.
[123] Kechelek, Douglas M. (Kechelek). "Data mining and antitrust." *Harvard Journal of Law & Technology*. Vol. 22, No. 2. Spring 2009 at 518 to 522
[124] Horst, Peter and Robert Duboff. "Don't let big data bury your brand." *Harvard Business Review*. November 2015.
[125] Buvat and KVG. 2014 at 2.

*ANTICOMPETITIVE EFFECTS OF THE PROPOSED CAPITAL ONE-DISCOVER MERGER*

Firms with this kind data market power can unfairly extract economic value from consumers.[126] The collection, aggregation, and modeling of large sets of consumer data allow the "development of first-degree price discrimination schemes [...] that allows producers to recover some or all of the economic surplus [...] reducing the welfare of consumers compared to a competitive market," according to a *Harvard Journal of Law & Technology* paper.[127]

Capital One also has already had a major data breach that exposed customers' personal information. In 2019, Capital One exposed its customers to one of the largest bank cyber-breaches in history. The breach exposed the personal data of 100 million credit cardholders and credit card applicants, including 140,000 Social Security numbers, 80,000 bank account numbers, birth dates, addresses, phone numbers, transactions, and credit scores and balances.[128] A 2022 study by Massachusetts Institute of Technology researchers found that although Capital One was viewed as among the "most cloud-savvy enterprises at the time of the breach," a series of "control failures at various levels" allowed the cyber attacker to exploit well-known vulnerabilities and decrypt the cardholders data.[129] The Office of the Comptroller of the Currency found that Capital One had insufficient security provisions for its cloud storage and the bank agreed to pay $80 million to settle the federal claims.[130] Capital One also agreed to a rigorous Federal Reserve consent order to improve internal governance and risk-management.[131] Capital One agreed to pay $190 million to settle a class action suit by cardholders that contended that the bank "knew of the particular security vulnerabilities that permitted the data breach" but did not fix them. [132]In 2023, the Federal Reserve released Capital One from its consent order that required stronger protections privacy protection measures,[133] seven months before it announced the Discover merger.

### *Merger would move customers to Capital One's weaker privacy protections:*
Capital One's privacy policies clearly state that it shares (and perhaps sells) a wide-range of personal data with third parties (likely data brokers and marketing firms). Capital One's online privacy notice specifies that it collects data including identity data (name, address, email, phone, birthdate, driver's license, Social Security number, etc.), transaction data (credit and debit card purchases, payments,

---

[126] Lande, Robert H. "Wealth transfers as the original and primary concern of antitrust: The efficiency interpretation challenged." *Hastings Law Journal*. Vol. 34, No. 65. 1982

[127] Kechelek. 2009 at 516.

[128] Flitter, Emily and Karen Weise. "Capital One data breach compromises data of over 100 million." *New York Times.* July 29, 2019; Avery, Dan. (Avery). "Capital One $190 million data breach settlement: Today is the last day to claim money." *CNET.* September 30, 2022.

[129] Khan, Shaharya et al. "A systemic analysis of the Capital One data breach: Critical lessons learned." *ACM Transactions on Privacy and Security.* Vol. 26, No. 1. November 2022.

[130] Flitter, Emily. "Capital One will pay $89 million over hack." *New York Times.* August 6, 2020.

[131] In the matter of Capital One Financial Corporation. Board of Governors of the Federal Reserve System. Cease and Desist Order Issued Upon Consent Pursuant to the Federal Deposit Insurance Act, as Amended. Docket N. 20-014-B-HC. August 20, 2020.

[132] Avery 2022.

[133] Pape, Carter. "Federal Reserve ends consent order regarding 2019 Capital One breach." *American Banker.* July 11, 2023.

transactions, third party billing information, and travel and event information), demographic data (gender, age, marital status, income, educational attainment, occupation, employment status, etc.), and device information (internet protocol or IP address, device type and operating system, geolocation, advertising and cookie identification such as Google Advertising or Apple advertising identification).[134] Capital One uses the data for marketing purposes but also to share with business partners, credit bureaus, and government entities and can share aggregated anonymized data with any third parties for any purpose.[135]

The Capital One Shopping browser extension lets customers compare prices or find coupons while online shopping.[136] But the terms and conditions of Capital One Shopping make clear that Capital One earns a commission from certain merchants, receives fees from merchants for prominent placement, and that Capital One can collect, use, and share certain information about users.[137] That information includes: personally identifiable information (name, email address, credit card number, billing address, phone number, or other identifying information), ecommerce information (browsing history, location data, purchase information), online or mobile activity (IP address, data about your mobile device, social media data, and data that can be anonymized and aggregated).[138]

In contrast, Discover shares less data and has stronger privacy protections than Capital One. Discover's privacy policy states that it only collects account transaction, balance and payment, transaction and credit history, and social security and account information necessary to perform its services and shares it for business purposes, internal and joint marketing, and for non-affiliates to market to customers.[139] Discover collects similar information from depositors but it does not share it with non-affiliates for marketing, stating plainly "we don't share."[140]

Discover's online privacy statement states that when customers use Discover online services the company collects data on account numbers, user identifications, email address, and may collect browser, internet protocol address, operating system, the prior and subsequent website visited, or geolocation and it shares the data with Discover and its affiliates as well as its business partners to fulfill requests or transactions, but it only shares "information with third parties at your request or with your authorization."[141] In 2022, Discover launched a service for customers to remove their personal information (names, addresses, phone numbers) from ten prominent

---

[134] Capital One. Capital One Online Privacy Policy. December 28, 2023.
[135] Ibid.
[136] Deloitte. "Putting digital at the heart of a strategy." April 22, 2021.
[137] Capital One Financial Corp. Capital One Shopping. United States Terms of Service. Update February 14, 2024.
[138] Ibid.
[139] Discover Card. "Facts: What does Discover Bank Do with Your Personal Information." Rev. 9/20. 2020.
[140] Discover Banking. "Facts: What does Discover Bank do with Your Personal Information?" BK.PP.LIN.0822. Rev. 08/22. 2022.
[141] Discover. Online Privacy Statement. Accessed April 2024.

people-search websites, a process that is time consuming for individuals, and re-scans these sites every three months.[142]

## V.  Vertical branded credit card merger would worsen competition by eliminating maverick, despite pro-competition rhetoric

The merger would transform Discover's maverick role in the branded credit card industry and create a stronger vertically-integrated dominant player. The merger will not inject competition into the oligopolistic payments markets, as Capital One contends. The combined firm would merely supplant Mastercard's number two branded credit card position while the market structure would remain essentially unchanged. The merger would actually worsen competition because it would be the only branded credit card that was also a top 10 bank and it would eliminate Discover's current maverick role. The combined firm would have less incentive to compete on price or quality of service, as Discover does today, and more incentive to exercise its market power to disadvantage merchants and raise interchange prices, ultimately harming consumers.

The major credit card networks (Visa, Mastercard, American Express, and Discover) operate as an oligopoly that have the market power to extract higher fees from merchants and consumers. The credit card network oligopoly is "likely to collude and demand higher interchange fees to maximize card issuers' profits," concluded the Federal Reserve Bank of Kansas City.[143] There have been decades of antitrust investigations into, lawsuits against, and settlements with the two dominant networks of Visa and Mastercard. Credit card networks charge swipe fees of between 2.5 percent to 4 percent on each transaction and these interchange fees rose to $172 billion in 2023, nearly nine times higher than the $20 billion in 2001.[144] Visa and Mastercard control three-quarters of the credit card transactions and each report net margins of about 50 percent.[145]

Capital One has argued that the merger would strengthen Discover's ability to take on the Visa-Mastercard duopoly.[146] The Capital One merger application states that the transaction "promises to inject competition into the [payments network] industry for the benefit of both consumers and merchants" and "promote competition by

---

[142] "Discover launches customer data privacy tool." *Pymnts*. April 20, 2022.

[143] Wang. 2006 at 38.

[144] National Retail Federation. "Policy Issues: Swipe Fees." 2024. Accessed April 2024.

[145] "Can the Visa-Mastercard duopoly be broken?" *Economist*, August 17, 2022.

[146] It is also conceivable that Capital One-Discover will *not* be able to challenge the Visa-Mastercard duopoly, in which case there will be no increase in payment market competition. After all, Discover has been unable to generate greater volume market shares for decades. The *Wall Street Journal* reported that it would be "a tall order" for the merged company to successfully compete with Visa's and Mastercard's credit card networks that are solely focused on their networks. And Capital One has softened its suggestion that it will transfer its credit card portfolio to Discover. Mason 2024; Demos, Telis. (Demos). "How Discover's network helps Capital One take on card and banking giants." *Wall Street Journal*. February 29, 2024.

deconcentrating these highly concentrated [payments network] markets, over which Visa and Mastercard tower."[147] The merged firm effectively would replace Mastercard as one of the dominant players, maintaining the credit card duopoly but with Visa and Discover as the top firms instead of Visa and Mastercard.

## A. Purported pro-competitive benefit misleading and does not outweigh anticompetitive effects of merger

Capital One suggests that improved efficiencies and lowered costs would spur more credit card competition and benefit consumers.[148] Purportedly, the combined firm would have the scale and efficiency to upend the entrenched market power of the Visa-Mastercard duopoly. Antitrust regulators take a skeptical view of these kinds of public relations pro-competitive promises and these contentions cannot justify a merger that violates antitrust law or tends to create a monopoly. The Capital One-Discover merger would substantially lessen competition in credit card lending, the pro-competitive contention is misleading, and it fails to meet the evidentiary requirements to sustain a pro-competitive efficiencies case.

The Capital One-Discover merger does not meet any of the necessary tests under the 2023 Merger Guidelines to fulfill a pro-competitive efficiency defense to counteract anticompetitive merger effects. First, the efficiency gain must be solely achievable from a merger, but Capital One could contract to shift its credit card business to Discover without the merger to create a stronger counterweight to the credit card market leaders.[149] Second, the promised efficiency gains are not verifiable and represent little more than the "subjective predictions of the merging parties."[150]

Third, the cost savings that drive the pro-competitive efficiencies in and off themselves do not demonstrate pro-competitive benefits since they would most likely be captured by the merging parties and not shared with customers and merchants. The merger would generate cost savings by eliminating the fees Capital One is currently paying to third-party payment network providers (primarily Mastercard) for its credit and debit transactions. This would also enable it to capture more of each interchange transaction since it would own the Discover network.[151] Capital One estimates that bringing the network in-house would generate $1.5 billion in annual savings by 2027.[152] Northeastern University economics professor John Kwoka raised the concern that "the merger will *preserve* the high fees and simply result in Capital One-Discover pocketing those fees more fully."[153] The merger guidelines clearly state

---

[147] Capital One OCC Application. 2024 at Exhibit 21. Memorandum on Competitive Considerations at 24 and 27 (411 and 414 in the application).
[148] *Ibid.* at 27 to 28 (414 to 415 in the application).
[149] DOJ/FTC 2023 Merger Guidelines. 2023 at 32.
[150] *Ibid.* at 33.
[151] Demos 2024.
[152] Capital One press release. 2024.
[153] Steining, Tanner. "Capital One and Discover merger may be a response to an adjacent concern: the Visa and Mastercard duopoly, economist says." *Northeastern Global News.* February 20, 2024.

*ANTICOMPETITIVE EFFECTS OF THE PROPOSED CAPITAL ONE-DISCOVER MERGER*



that cost-saving efficiencies that "merely benefit the merging firms [...] are not cognizable" as contributing to a pro-competitive merger benefit.[154]

Even if there were pro-competitive benefits in the credit card network market, they would not outweigh the demonstrated anticompetitive impacts in the credit card lending market. The court blocked the JetBlue-Spirit airline merger after it found that the *proven* pro-competitive benefits nonetheless "fails to establish that the proposed merger would not substantially lessen competition in at least some of the relevant markets."[155] The Supreme Court rejected the "concept of 'countervailing power'" in the Philadelphia National Bank case and ruled that the proposed merger's purported pro-competitive benefits in one market cannot justify anticompetitive effects in another market.[156]

## B.  Merger would displace Mastercard but maintain current market structure

The merger would not rejuvenate competition in the credit card payment network, it would only re-arrange the players in market while maintaining the current market structure. Capital One intends to shift its payments business to Discover. Capital One CEO Fairbank stated that "the real driving motivation is to get as much business as we can to [Discover's] network."[157] The merger application states that Capital One intends to increase Discover market share by "adding immediate scale to the networks [...] by adding new debit and credit volumes to the Discover networks."[158]

---

[154] DOJ/FTC 2023 Merger Guidelines. 2023 at 33.
[155] United States v. JetBlue Airways Corporation (2024). Civil Action No. 23-10511-WGY. U.S. District Court of Massachusetts. January 16, 2024 at 105.
[156] U.S. v. PNB. 1963 at 370.
[157] Capital One Investor Call. 2024 at 1:03:40.
[158] Capital One OCC Application. 2024 at Exhibit 21. Memorandum on Competitive Considerations at 27 (414 in the application).

*APRIL 2024*

That shift is really moving Capital One's credit and debit business that now runs primarily on the Mastercard network to Discover. Today, essentially all of Capital One's credit cards are Mastercard.[139] Mastercard has acknowledged that it has had "a longstanding and a really strong relationship with Capital One for the longest time" and that the "larger set of [Capital One] volumes that we have is on the credit side."[160] It is likely that a only a small portion of Capital One's outstanding credit card debt is currently on Visa cards and the shift will primarily reduce Mastercard's position.

Shifting Capital One's credit cards from Mastercard and Visa to Discover will not inject competition in the market, it will just change the names of the dominant players. Assuming that all the Capital One outstanding credit card debt are on Mastercard-branded cards, Mastercard's estimated share of loans would fall from 27.4 percent of the outstanding credit card debt (including the 13.1 percent issued by Capital One) to 14.3 percent, and shifting Capital One's outstanding debt to Discover would increase Discover's market share to 22.2 percent.[161] If instead, 80 percent of the Capital One debt is on Mastercard, the shift to Discover would reduce estimated Mastercard's market share to 16.9 percent, but Discover's 22.2 percent market share would become more than 30 percent larger than Mastercard (see Figure 4). Rearranging the players does not change the market structure or reduce concentration — the market remains essentially unchanged and highly concentrated with an HHI of over 3,500 in either case.

## C. Merger transforms Discover from maverick to market leader and raises consumer and merchant costs

Discover is the maverick upstart in the credit card market that is competing against the "dominant position and marketing and pricing power of Visa and Mastercard"[162] The merger would make Discover a dominant player that no longer needed to compete vigorously on price and quality to entice new cardholders or merchants. It could more easily extract revenues and profits by flexing its market power over merchants and cardholders — a strategy Capital One has suggested was a significant motivation behind the proposed merger. It would have the ability and incentive to

---

[139] Substantially all of the current Capital One credit cards appear to be Mastercard cards, although previously issued Visa's continue to be serviced. Capital One only lists four retail co-branded Visa cards (Pottery Barn, William Sonoma, West Elm, and a Key Rewards card. Capital One. Compare All Cards). Capital One's description of Visa benefits lists cards that are not currently available (Capital One. Visa and Mastercard Benefits Guide). Visa lists only two Capital One credit cards on its website (Venture Rewards and Venture X Rewards. Visa. Capital One Credit Cards) while Mastercard lists nine families of cards (Mastercard. Capital One Credit Cards), including the VentureOne family of cards that appears to be replacing the Visa Venture cards.

[160] Mehra, Sachin. Mastercard, Inc. Chief Financial Officer. [Transcript]. "Mastercard Incorporated (MA) Management Presents at BofA Virtual Electronic Payments Symposium." March 18, 2024.

[161] AFREF estimate based on 2023 outstanding credit card debt market share for Capital One, Discover, and American Express (13.1 percent, 9.1 percent, and 8.7 percent, respectively). Visa and Mastercard outstanding debt amounted to the non-Discover and American Express market share (82.2 percent) and there is about twice the outstanding debt on Visa cards as on Mastercard card (making the Visa market share 54.8 percent and Mastercard market share 27.4 percent). Caporal 2024.

[162] Discover SEC Form 10-K. 2023 at 31.

tacitly coordinate prices and strategies with the dominant Visa. As the merger guidelines notes "a merger that eliminates a maverick or significantly changes its incentives increases the susceptibility to coordination."[163]

Today, Discover's credit card is a distant fourth place player in a four-player credit card network game. Its cards have 4 percent of purchase volume, a tiny portion of Visa's 52 percent, Mastercard's 25 percent, and American Express' 20 percent.[164] Discover credit card merchant acceptance is at near parity with Visa, Mastercard, and American Express (with 99 percent of merchants accepting Discover), but consumers still perceive the card as having lower acceptance levels affecting its ability to draw new customers.[165]

Discover competes with the major credit cards and credit card lenders on the basis of price and quality. Discover states that it competes on "customer perception of service quality, brand image, reputation.[166] It operates high-quality, 24-hour U.S.-based customer service call centers and it has been in the top 2 of J.D. Power's Overall Customer Satisfaction Rankings for 17 years.[167] Discover also competes on price offering lower swipe fees (mostly interchange fees) to merchants and lower interest rates to cardholders. In 2023, Discover's average interchange fee rates ranged from 1.10 percent to 2.40 percent, a lower range than the fees charged by Visa or Mastercard that range from 1.15 percent to 3.15 percent or American Express that range from 1.10 percent to 3.15 percent.[168]

Discover offers some of the most affordable, lowest interest rate cards. The median interest rate Discover offers on cards to customers with near-prime credit scores is lower than the other top 10 credit card issuers — 1.5 percentage points lower than the median interest rates of all the cards offered by the top ten issuers (see Figure 5). For customers with prime credit scores, Discover's median interest rate is 1.38 percentage points below the median of all cards offered by the top ten issuers. Discover ranks third, but it is likely because Bank of America and Citibank target customers with higher credit scores than Discover's more middle-income consumers. In contrast, Capital One offers credit cards with median interest rates that are above the average for all credit cards offered by the top ten issuers, including among the highest for customers with prime credit scores.

---

[163] DOJ/FTC 2023 Merger Guidelines. 2023 at 9.
[164] Capital One OCC Application. 2024 at Exhibit 21. Memorandum on Competitive Considerations at 25 (412 in the application).
[165] Discover SEC Form 10-K. 2023 at 10.
[166] Discover SEC Form 10-K. 2023 at 10.
[167] *Ibid.* 2023 at 7; Capital One-Discover Investor Presentation. 2024 at 10.
[168] Daly, Lyle. "Average credit card processing fees and costs in 2023." *Motley Fool.* April 2, 2024.

The merged Capital One-Discover would no longer need to offer lower merchant fees, lower-priced credit cards, or compete vigorously on quality. Instead, it would have the incentive to use its more formidable market power to impose price hikes on merchants and cardholders. Indeed, this was a key strategic rationale for the merger. Capital One pursued the acquisition to combine a payments network *and* a credit card issuing bank to increase leverage over merchants. The Capital One CEO stated that "the Holy Grail is to be able to be an issuer with one's own network so that one can deal directly with merchants."[169] The *American Banker* said that Capital One wanted the deal to "[gain] cost advantages and strategic benefits from owning its own payment network."[170] The bigger pool of cardmembers would give Capital One more leverage than Discover alone has had over the merchant relationships and enable the combined company to charge higher merchant fees.[171] The Merchants Payments Coalition stated that the proposed merger "won't lead to badly needed competition over credit card 'swipe' fees."[172]

The Capital One merger application does not state that it will maintain Discover's lower interest rates or that it will deploy the merger's purported pro-competitive muscle to lower prices for consumers. Instead, it states it will be "making more attractive" its consumer credit cards.[173] This is likely to mean enhanced reward programs, but these spending incentives primarily reward more affluent, high-spending customers who are more likely to have rewards cards and tend to spend more on their cards to rack up rewards that are proportional to spending.[174] The costs of rewards are paid through higher merchant interchange fees. For example, Capital One reports its credit card interchange fee revenue net of its rewards expenditures;



**Fig. 5: Median purchase APR for all cards by top 10 credit card lenders**
(near prime on left,  prime on right)

| Lender | Near Prime APR | | Lender | Prime APR |
|---|---|---|---|---|
| Synchrony | 29.99% | | AmEx | 27.24% |
| Wells Fargo | 29.99% | | Synchrony | 25.24% |
| Barclays | 29.74% | | Cap One | 25.24% |
| AmEx | 29.24% | | Wells Fargo | 24.99% |
| Cap One | 29.24% | | Barclays | 24.24% |
| Citi | 28.99% | | All top 10 | 22.99% |
| All top 10 | 28.74% | | US Bank | 22.74% |
| US Bank | 28.74% | | Chase | 22.24% |
| Chase | 27.99% | | Discover | 21.62% |
| BofA | 27.49% | | BofA | 20.74% |
| Discover | 27.24% | | Citi | 18.99% |

[169] Son. 2024.
[170] Fitzgerald 2024.
[171] Demos 2024.
[172] Merchants Payment Coalition. [Press release]. "Merchants say Capital One/Discover deal shows need for Credit Card Competition Act." February 21, 2024.
[173] Capital One OCC Application. 2024 at Exhibit 21. Memorandum on Competitive Considerations at 28 (415 in the application).
[174] Felt, Marie-Hélène et al. (Felt et al.). Federal Reserve Bank of Kansas City. "Distributional Effects of Payment Card Pricing and Merchant Cost Pass-through in the United States and Canada." RWP 20-18. December 2020 at 2.

in 2023 it reported $4.3 billion in net interchange income after accounting for $8.2 billion in rewards programs.[175] A 2020 Federal Reserve Bank of Kansas City study found that merchant interchange fees were far higher for rewards credit cards than non-rewards cards (1.89 percent for non-rewards cards, 2.04 percent for basic rewards cards, and 2.49 percent for premium rewards cards), according to a.[176]

These merchant fees are ultimately passed on to consumers, effectively charging all consumers to fund reward benefits for generally more affluent consumers, a regressive redistribution of value.[177] A 2023 Federal Reserve Board paper found that rewards programs cost customers with non-prime credit scores more than comparable reward-free cards but benefited customers with prime credit scores and amounted to an annualized redistribution of $15.1 billion from consumers with non-prime scores to those with prime scores.[178] The Kansas City Fed paper found that the combination of merchant cost pass-through, rewards, and credit card fees acted as regressive economic "transfers from low-income to high-income consumers."[179]

The proposed merger would reduce not enhance competition in credit card payment networks. It would not shake up the market but merely rearrange the players, putting the merged firm in the number two market position but leaving the structure of the market unchanged. But by leapfrogging American Express and Mastercard, the merger would increase Capital One-Discover's incentive and ability to tacitly coordinate on interchange prices. The merger would eliminate Discover's current maverick incentives to compete on price and quality, raising consumer and merchant credit card costs that especially disadvantage lower-income consumers.

## VI. Merger would facilitate anticompetitive regulatory evasion on debit card fees

The proposed merger would join the debit card transaction volume from Capital One's deposit accounts to Discover's debit card processing networks (either Discover's signature debit card transactions or its Discover's Pulse network) which would allow Capital One to evade the debit card transaction fee caps that apply to banks and raise prices on consumers and merchants. Vertical mergers that allow a regulated firm to move its business lines or profits to evade regulatory price limitations give the firm the ability and incentive to raise prices, harm consumers, and erode market competition. This anticompetitive harm has "the purest academic pedigree and has been explored in depth," according to former Deputy Assistant

---

[175] Capital One SEC Form 10-K. 2023 at 214 to 215.

[176] Felt et al. 2020 at 11.

[177] Klein, Aaron. "What the fight over the Capital One-Discover merger misses about our terrible credit card system." *New York Times*. March 15, 2004.

[178] Agarwal, Sumit et al. Federal Reserve Board. "Who Pays for Rewards? Redistribution in the Credit Card Market." Finance and Economics Discussion Series No. 2023-007. 2023 at 3.

[179] Felt et al. 2020 at 21 and 32.

Attorney General Steven Sunshine.[180] As 26 State Attorneys General noted, vertical takeovers that enable regulatory evasion "can harm consumers by distorting prices."[181]

The Capital One-Discover vertical debit card and debit network integration facilitates regulatory evasion that would substantially lessen competition. The 1984 vertical merger guidelines identified the anticompetitive harm from non-horizontal mergers that could be used by a firm "subject to rate regulation as a tool for circumventing that regulation" that would allow the firm to pass inflated prices onto consumers.[182] The U.S. Department of Justice and Federal Trade Commission 2023 merger guidelines recognize that regulatory evasion is a mechanism that can substantially lessen competition. Vertical mergers that enable firms to capitalize on regulatory loopholes to raise their prices "diminish[es] competitive constraints" and "rivalry that incentivizes businesses to offer lower prices" that the merger guidelines identify as contravening the Clayton Act's prohibition against mergers that substantially lessen competition.[183] The guidelines specifically identify mergers that "would enable firms to avoid a regulatory constraint because that constraint was applicable to only one of the merging firms" as posing a risk that the merger would substantially lessen competition or tend to create a monopoly in violation of the Clayton Act.[184]

When consumers use debit cards to make purchases, merchants pay debit interchange fees to facilitate the debit card transaction to the debit card issuer (the consumer's bank).[185] Federal law prohibits banks from charging interchange fees that are not "reasonable and proportional to the [transaction] cost."[186] The regulations that implement this statutory provision, known as the Durbin amendment for its author Sen. Richard Durbin, exclude three-party transactions where the card issuer owns the network (so the transaction is between the cardholder, Issuer-owned network, and the merchant).[187] Discover and American Express are exempt from the Durbin amendment fee caps because they are networks and card issuers (unlike Visa and Mastercard whose branded cards are issued by banks).[188]

Debit interchange fees — and the regulations that constrain Capital One's ability to raise these fees — are of critical interest to the company. It's Securities and Exchange Commission filings state that debit card interchange fees are "a meaningful source of revenue for our credit and debit card businesses" and that the regulations that "limits

[180] Sunshine, Steven C. (Sunshine). Deputy Assistant Attorney General. U.S. Department of Justice. Speech before the American Bar Association. "Vertical Merger Enforcement Policy." April 5, 1995.

[181] Public Comments of 26 Attorneys General on Draft Vertical Merger Guidelines. U.S. Department of Justice and Federal Trade Commission. February 26, 2020 at 6.

[182] U.S. Department of Justice. 1984 Merger Guidelines. 1984 at 4.23.

[183] DOJ/FTC 2023 Merger Guidelines. 2023 at 1.

[184] *Ibid.* at 29.

[185] A smaller network transaction fee is paid by the debit card issuing bank and the merchant's bank.

[186] 15 USC §1693o-2(a)(2).

[187] Federal Reserve Board. Debit Card Interchange Fees and Routing Final Rule. 76 Fed. Reg. 139. July 20, 2011 at 43305 and 43404. Smaller banks with fewer than $10 billion in assets are also exempt from the Durbin interchange caps. 15 USC §1693o-2(a)(6).

[188] Getter, Darryl E. (Getter). Congressional Research Service. "Regulation of Debit Interchange Fees." CRS No. R41913. May 16, 2017 at 4 to 5; Mason 2024.

*ANTICOMPETITIVE EFFECTS OF THE PROPOSED CAPITAL ONE-DISCOVER MERGER*

| Table 3: Discover's 2022 debit interchange fees compared to regulated fee cap | | | | | | |
|---|---|---|---|---|---|---|
| | Av. Transaction Size | Av. Debit Interchange Fee | Allowable under current Durbin | Current Overcharge | Allowable under proposed Durbin | Overcharge under proposed rule |
| Discover (swipe) | $36.08 | 51¢ | 23.8¢ | 114% | 17.1¢ | 197% |
| Pulse (e-commerce) | $49.89 | 30¢ | 24.5¢ | 22% | 17.6¢ | 70% |

Source; Federal Reserve Board. 98 percent of Discover and 63 percent of the Pulse debit transactions are exempt from Durbin.[198]

the amount of interchange fees that can be charged per debit card transaction" affect its revenues.[189] Even under the debit interchange fee caps on banks, Capital One's non-interest income rose to $589 million in 2023 "primarily driven by higher interchange fees from an increase in debit card purchase volume."[190]

Capital One has promoted the merger's ability to facilitate regulatory arbitrage to get around federal debit interchange caps. CEO Richard Fairbank specifically mentioned to investors when discussing the merger that the Durbin amendment regulatory loophole "explicitly exclude networks like Discover."[191] Capital One intends to rapidly shift its "entire debit card business over to [Discover's] debit network," both the Discover signature debit (mostly in-person, swipe debit cards) and the Pulse network (mostly card-not-present or e-commerce).[192] It expects it will have moved 25 million debit accounts to Discover's debit networks by 2025.[193]

Capital One estimates the shift to Discover debit card networks could generate $1.2 billion in savings and revenue increases.[194] This revenue boost comes from becoming the network and issuer (so it does not have to split interchange fees with another network operator) but also because it will be able to raise fees in excess of the debit interchange fee cap.[195] Currently, the cap on debit interchange fees is set at 22¢ plus 5 basis points, but the Federal Reserve has proposed lowering the cap to reflect the actual processing costs to 15.7¢ and 4 basis points.[196] The proposed debit interchange rules do not close the three-party loophole that allows Discover to charge debit interchange fees above the cap.[197]

---

[189] Capital One SEC Form 10-K. 2023 at 14 and 37.
[190] *Ibid.* at 69.
[191] Capital One Investor Call. 2024 at 1:10:00.
[192] *Ibid.* at 12:20; Son. 2024.
[193] Fitzgerald 2024.
[194] Huffman. 2024.
[195] Mason 2024.
[196] The cap includes a fraud-prevention adjustment that is currently 1¢ of the 22¢ and is proposed to rise to 1.3¢ of the 15.7¢. Federal Reserve Board. Debit Card Interchange Fees and Routing Notice of Proposed Rulemaking. 88 Fed. Reg. 218. November 14, 2023 at 78100 et seq.
[198] Federal Reserve Board. (FRB Debit Card Interchange Fees). Regulation II (Debit Card Interchange Fees and Routing). Average Debit Card Interchange Fee by Payment Card Network. September 27, 2023.

Capital One would generate substantial revenues and profits from debit interchange fees by switching its debit transactions to Discover's networks. Capital One's debit card currently uses the Mastercard network which has average interchange fees of 24¢ for transactions covered by the Durbin amendment caps.[199] Most of Discover's debit transactions are excluded from the interchange fee caps and are significantly higher — 51¢ for typical swipe transactions and 30¢ for typical card-not-present e-commerce transactions.[200] The interchange fees are twice the debit fee cap (and nearly triple the proposed cap) for swipe transactions and are over 20 percent higher for e-commerce (see Table 3).

The proposed merger would give Capital One the ability to shift its debit card business to Discover to evade regulatory debit interchange fee caps and incentive to generate more revenues from interchange fees. Not only would its interchange revenue rise substantially, but it also would eliminate its payments to a network operator. Capital One's regulatory evasion strategy is considerably more straightforward than other regulatory evasion strategies found to be anticompetitve that relied on a more complex multi-step process. For example, AT&T's subsidiary telephone equipment manufacturer could raise its prices to increase the input costs for telephone service and justify increasing regulated prices.[201] Utility and power generation mergers have been challenged for being able to artificially hike electricity production costs to raise allowable utility prices for consumers.[202] The British Telecom-MCI joint venture created an incentive for MCI to evade a reciprocal pricing and call volume agreement that would give it the ability and incentive to raise the cross-border call prices.[203] Regulators struggle to enforce price caps against these complex vertical strategies that allow vertically merged firms to raise allowable consumer prices.[204] But in the proposed Capital One-Discover merger, one firm is a regulated entity and the other is unregulated and shifting business lines to the unregulated party allows it to easily raise revenues by raising interchange prices.

---

[198] Federal Reserve Board. (FRB Debit Card Interchange Fees). Regulation II (Debit Card Interchange Fees and Routing). Average Debit Card Interchange Fee by Payment Card Network. September 27, 2023.

[199] Capital One. 360 Checking Debit Card. Accessed March 2024; Mastercard charges average interchange fees of 24¢ for its dual message signature swipe cards and the POS transactions on its Maestro network. FRB Debit Card Interchange Fees 2023.

[200] FRB Debit Card Interchange Fees 2023.

[201] Salop, Steven C. and Daniel P. Culley. "Revising the US vertical merger guidelines: Policy issues and an interim guide for practitioners." *Journal of Antitrust Enforcement.* 2015 at 31.

[202] Moss, Diana. American Antitrust Institute. Acquisition and Disposition of Merchant Generation Assets by Public Utilities before the Federal Energy Regulatory Commission. Docket No. PL04-9-000. August 2018 at 3.

[203] Sunshine 1995.

[204] American Antitrust Institute. Brief of Amicus Curiae the American Antitrust Institute in Support of Petitioner the Environmental Defense Fund and Reversal. Environmental Defense Fund v. Federal Energy Regulatory Commission. U.S. Court of Appeals Case. No. 20-1016. July 3, 2020 at 11.

## VII.  Merger would create platform conflict of interest with branch banking rivals on Discover's debit networks

The proposed merger will disadvantage branch banking rivals of Capital One that rely on the Discover Pulse debit network for their depositors to access point-of-sale and ATM transactions. Currently, Discover offers Pulse debit payment network services to 4,100 banks,[205] but although Discover offers debit cards to its digital depositors, it does not compete with the banks that use the Pulse network for retail branch customers. Capital One ownership of the Pulse network would change that dynamic. It would change the incentives with regard to providing equal access to the payments platform network because Capital One is a rival for branch banking services with the banks that currently rely on the Pulse network. Capital One would have an incentive to raise debit network transaction costs or otherwise foreclose access to the Pulse network not only to raise revenues but to reduce the earnings of their rivals and make Capital One's depository accounts and branch banking more attractive to prospective customers.

The vertical platform elements of the merger enable Capital One to leverage its market power against its rivals by favoring its own participation on the debit network over those of its competitor banks participation in the Pulse debit network. Capital One would have the "ability and incentive to limit access to the related product so as to weaken or exclude some of its rivals" as the merger guidelines describe vertical foreclosure.[206] Because the vertical merger is a platform participant (Capital One's use of a debit network) with a platform (the Pulse debit network) it creates a conflict of interest between Capital One's role operating the Pulse network and its role as competitor with the other banks that participate on the Pulse network. The merger guidelines state that these conflicts can harm competition when a merger party "has an incentive to give its own products and services an advantage over other participants competing on the platform."[207]

Debit networks provide the architecture and interface that allow depositors to use their debit cards to access cash from ATMs and make debit purchases at point-of-service merchants and e-commerce. Today, consumers are as likely to use their debit as credit card. In 2021, there were over 92 billion debit card transactions and debit cards made up nearly half of all card transactions by dollar value ($4.55 trillion out of $9.43 trillion total card payments).[208] A 2022 S&P study found that consumers preferred to use their debit card over their credit card and the preference was stronger for lower-income households.[209]

---

[205] Fitzgerald 2024; Discover SEC Form 10-K. 2023 at 4.

[206] DOJ/FTC 2023 Merger Guidelines. 2023 at 13.

[207] *Ibid.* at 25.

[208] Federal Reserve Board. (FRB Payments Study). "Federal Reserve Payments Study: 2022 Triennial Initial Data Release." July 27, 2023 at 2 and at Table 1.

[209] Wooldridge, McKayla. S&P Global Market Intelligence. "Debit Surpasses Credit as Consumers' Preferred Payment Card." September 27, 202.

*APRIL 2024*

Pulse grew out of a Texas-based regional debit and electronic funds transfer network between banks that provided reciprocal ATM access to their depositors; Discover purchased it in 2005.[210] The Pulse debit network earns transaction fees from both the debit card issuing banks (an average of 3¢ per transaction) and the merchants (an average of 5¢).[211] The Pulse network transaction fees generated $300 million in revenue on $285 billion in transactions in 2023.[212]

Discover has stated that Pulse now includes "large and small banks, thrifts and credit unions across the country."[213] It has had Citibank, Santander, GE Money, First National Bank of Omaha, and Candance Bank among the issuers on the network.[214] But there are also thousands of smaller and community banks.[215]

The merger would increase concentration in already concentrated debit network markets and create the ability and incentive for the Pulse network to disadvantage rival banks' access to the debit network — especially smaller banks in markets that compete with Capital One for retail banking customers.

***Debit networks exercise their market power to disadvantage merchants and smaller banks:*** Banks contract with debit networks to provide transaction services to their depositors. Banks receive the lion's share of the interchange fee retailers pay to enable point-of-sale debit transactions, but they have internal processing costs that include a transaction fee that banks pay to the network that affect the net interchange fee revenues. Federal regulations under the Durbin rule cap the interchange fee banks can charge, but smaller banks with assets below $10 billion are exempt from the interchange fee cap, allowing smaller banks to charge higher, Durbin-exempt

---

[210] Clark Neeley, Michelle. Federal Reserve Bank of St. Louis. "What price convenience? The ATM surcharge debate." *Regional Economist.* July 1, 1997; Discover Financial Services. PULSE Network. "PULSE reflects on 40 years of debit." 2021; Discover Financial Services. [Press release]. "Merger of Discover Financial Services and Pulse EFT Association closes following Pulse member approval." January 12, 2005.

[211] Pulse Network, LLC. (Pulse v. Visa Brief). Redacted Opening Brief for Plaintiff Appellant Pulse Network, LLC. Pulse Network, LLC v. Visa, Incorporated. U.S. Court of Appeals for the Fifth Circuit. January 30, 2019 at 6.

[212] Discover SEC Form 10-K. 2023 at 32 and 57; Son. 2024.

[213] Discover Financial Services. Meeting between Federal Reserve Staff and Representatives of Discover Financial Services (Discover). October 28, 2010 at 4.

[214] Discover Financial Services. "2013 Financial Community Briefing." SEC Exhibit 99.1. March 12, 2013 at 8.

[215] It is difficult to identify the Pulse network banks, but the sample include institutions operating in states where Capital One has branches as well as minority serving institutions. HealthShare Credit Union. ATM Locators. Accessed March 2024; Acevedo, Sophia. "Golden Bank Review 2024." *Business Insider.* February 26, 2024; Bresnick Kendler, Peggy. "Park Bank, Altra Federal Credit Union sign long-term agreements with PULSE." *Bank Systems & Technology.* January 30, 2009; Midwest Liberty Credit Union. [Press release]. "Midwest Liberty Credit Union Expands to serve more communities." February 1, 2024; "United Commercial Bank joins Pulse ATM network, accesses China UnionPay." *ATM Marketplace.* May 14, 2007; "Fulton Financial adds Pulse to its offerings." *ATM Marketplace.* January 30, 2006; "Woodforest National Bank adds Postilion." *ATM Marketplace.* December 19, 2001; Coltharp, Richard. "Citizens celebrates 50ᵗʰ, plus one." *Las Cruces Bulletin.* April 8, 2021; First State Bank. Livingston, Texas. ATM Cards. Accessed March 2024; Feliciana Federal Credit Union. QwikCash ATM. Accessed March 2024; Florida Customs Federal Credit Union. ATM Locations. Accessed March 2024; ANG Federal Credit Union. ATM Cards. Accessed March 2024; Citizens State Bank. ATM. Accessed March 2024.

interchange fees.[216] Additionally, the Durbin rule requires banks to embed two, unaffiliated networks for each debit card (typically a signature debit network and a PIN network).[217]

There are two types of debit networks, one that allows cardholders to sign for a point-of-sale transaction like a credit card (or "signature debit" networks) and one that historically required cardholders to enter a PIN on a keypad (or "PIN debit" networks), although recently PIN-less transactions have become available through a merchant card reader. Typically, banks provide a signature debit option (offered only by Visa, Mastercard, and Discover) and a PIN debit option (offered by a small handful of firms, including Visa, Mastercard, and Discover's Pulse).

Banks choose what network to embed on the debit cards they issue to depositors based on the share of the interchange fees they receive on merchant transactions (the net interchange revenue after paying the network transaction fee).[218] Larger banks can negotiate more favorable debit network terms and prices (network fees) based on the volumes of transactions.[219] Smaller banks rely on the debit networks for revenues from interchange fees and debit card services are essential to their depositor customers.[220]

There only a few firms that operate debit networks.[221] Only Visa, Mastercard, and Discover networks offer "signature debit" networks.[222] The PIN networks grew out of regional electronic funds transfer networks built to service ATMs and have consolidated into a few players (including Finserv and FIS as well as Discover's Pulse, Visa's Interlink, and Mastercard's Maestro) that are more prevalent in e-commerce transaction, in part because the signature networks discourage the use of cheaper PIN debit transactions at point-of-sale transactions to extract fees from merchants. Average signature network interchange fees (for Durbin-capped and Durbin-exempt transactions) are 38¢ compared to 25¢ for PIN network interchange fees.[223]

The debit card networks exercise market power over merchants by using tacit coordination to keep interchange fees as high as allowable. The few companies that have the strongest networks — primarily the Visa and Mastercard signature networks — have used their market power to disadvantage rivals, discourage debit card issuers from encouraging non-signature debit transactions, and imposed high fees and

---

[216] 15 USC §1693o-2(a)(6); Hayashi, Fumiko. (Hayashi 2012). "The new debit card regulations: Initial effects on networks and banks." *Federal Reserve Bank of Kansas City Economic Review*. Fourth quarter 2012 at 90.

[217] 15 USC §1693o-2(b).

[218] Pulse v. Visa Brief. 2019 at 6.

[219] Getter. 2017 at 3.

[220] Hayashi, Fumiko. Federal Reserve Bank of Kansas City. "Community Bank Access to Payment Card Networks: Has it Become More Expensive." Working Paper WP 03-02. December 11, 2003 at 3.

[221] FRB Payments Study. 2023 at Table 1; Redbridge. "Are Visa's debit routing practices making PIN and PINless debit transactions better or worse for merchants?" November 11, 2021.

[222] Hayashi. 2012 at 82.

[223] FRB Debit Card Interchange Fees 2023.

conditions on merchants.[224] Debit networks have imposed various anticompetitive quasi-tying conditions on merchants in exchange for accepting customers' debit transactions (such as prohibiting surcharges, requiring the acceptance of all network cards irrespective of type of card or issuer, and requiring acceptance at all outlets).[225] In 2024, Visa and Mastercard proposed settling an antitrust case by committing to reducing swipe fees on signature debit (and credit card) transactions and prohibiting anti-steering requirements that barred merchants from encouraging customers to use an alternate lower-cost PIN debit network.[226]

Discover has not shied away from flexing the Pulse market power to extract concessions from merchants, customers, and banks. Pulse increased the fees it charged merchants for exempt transactions after the Durbin rule went into effect.[227] Prior to 2012, Pulse had "increasing success in obtaining exclusive placement" on banks' debit cards (before this was prohibited by the Durbin amendment).[228] Pulse also has attempted to use its market power to press banks to adopt Pulse as the non-Visa or Mastercard PIN debit network on their debit cards.[229]

The proposed merger would give Capital One the ability and incentive to disadvantage rival banks on the Pulse network. Capital One would gain a competitive advantage over its banking rivals, because Pulse would carry its debit transactions, lowering its debit network fees and increasing its net interchange revenues.[230] The merger would also strengthen the Discover/Pulse network by moving Capital One's debit business to Discover's signature debit network to evade Durbin fee caps *and* discouraging the use of the alternate PIN network it is obligated to provide to cardholders.

Most importantly, Capital One would have an incentive to raise Pulse transaction fees on rival banks to lower their net interchange revenue, which would compound Capital One's competitive advantage as its internal costs fall and its rivals' costs rise. This exercise of network platform market power would be especially disadvantageous to smaller banks that compete in markets where Capital One has retail branches. Debit networks like Pulse solicit smaller banks to the network by offering higher interchange fees (higher, but without driving merchants away).[231] But they also have an incentive to raise the per transaction fee (that come out of interchange fees) they charge the smaller banks to capture as much of the Durbin-exempt interchange fee revenue as possible. Smaller banks pay the highest network transaction fees. Banks

[224] Constantine, Lloyd. "The need for Federal Reserve and antitrust intervention in the failed U.S. debit and credit card markets." *Proceedings of Payments System Research Conferences*. May 2005.
[225] Getter. 2017 at 4.
[226] Tempel, Jonathan. "Visa, Mastercard reach $30 billion settlement over credit card fees." *Reuters*. March 27, 2024.
[227] Hayashi. 2012 at 92.
[228] Pulse v. Visa Brief. 2019 at 12.
[229] Visa, Inc. Brief of Appellee Visa Inc. Pulse Network, LLC v. Visa, Incorporated. United States District Court for the Southern District of Texas, Houston Division, Case No. 4:14-cv-3391. April 5, 2019 at 8.
[230] Capital One Investor Call. 2024 at 1:03:40; Buchwald, Elisabeth. "Capital One is buying Discover for $35 billion in biggest deal so far this year." *CNN*. February 20, 2024.
[231] Hayashi. 2012 at 93.

with fewer than one million debit transactions pay 9.7¢ in network fees per transaction and banks with between one and one hundred million transactions (which likely includes some Durbin-exempt banks) paid 4.6¢ per transaction (compared to 0.6¢ by the biggest banks with over 100 million transactions).[232]

Capital One would have the ability and incentive to raise its interchange fees to attract banks as well as increase transaction fees because of the debit network concentration. Pulse's Durbin-exempt Pulse transaction interchange fees for small banks are high but with room for increases compared to its rivals, averaging 30¢ per transaction (below Visa's Interlink 36¢ and FIS' NYCE 32¢ but above the 20¢ to 22¢ interchange fees of Mastercard's Maestro and Fiserv's STAR and Accel).[233] By raising interchange fees and raising network fees, Capital One could keep its rival banks on the network and constrain the net interchange fee revenues that are critical to smaller banks balance sheets. This would give Capital One an advantage over smaller rival banks and enable it to offer more services or lower prices to lure depositor customers.

## VIII.   Conclusion

The proposed Capital One-Discover merger would substantially undermine competition in multiple markets and dimensions in ways that would disadvantage consumers, merchants, and communities. The merger would increase concentration in credit card lending markets — to an extent that is presumptively anticompetitive in non-prime credit card lending — and subject consumers to price hikes that would be difficult or effectively impossible to avoid. The acquisition would increase market power in data markets and give Capital One the ability to exploit the personal information of Discover cardholders. The merger would eliminate Discover's current maverick incentive to compete on price and quality, reducing competition in branded credit cards (rather than injecting new competition, as Capital One contends). The transaction would enable Capital One to evade federal debit interchange fee regulations and impose anticompetitive price hikes on merchants (and ultimately consumers). And the merger would give Capital One the incentive and ability to disadvantage its retail banking rivals that rely on the Discover Pulse debit network. The Department of Justice and banking regulators should enjoin this anticompetitive acquisition that contravenes the Clayton Act, the Bank Merger Act, and the Bank Holding Company Act's prohibition on mergers that substantially lessen competition, tend to create monopolies, or otherwise be in restraint of trade.

---

[232] Federal Reserve Board. Database. Interchange Fee Revenue, Covered Issuer Costs, and Covered Issuer and Merchant Fraud Losses Related to Debit Card Transactions. 2023 at Table 13.
[233] FRB Debit Card Interchange Fees 2023.

*APRIL 2024*

# IX. Appendix

| Total and Nonprime Outstanding Credit Card Loans by Issuer 2023 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Total Outstanding Credit Card Loans | | | | Nonprime Outstanding Credit Card Loans | | | | |
| Issuer† | Loans ($B) | Rank | Market Share | HHI | Loans ($B) | Rank | Market Share | HHI | Nonprime share of total |
| JPMorgan Chase | $211.2 | 1 | 18.7% | 350 | $29.6 | 3 | 13.4% | 180 | 14% |
| Citibank | $164.7 | 2 | 14.6% | 213 | $33.7 | 2 | 15.3% | 234 | 20% |
| Capital One | $147.7 | 3 | 13.1% | 171 | $47.3 | 1 | 21.5% | 460 | 32% |
| Discover | $102.3 | 4 | 9.1% | 82 | $20.0 | 5 | 9.1% | 83 | 20% |
| Bank of America | $102.2 | 5 | 9.1% | 82 | $17.0 | 6 | 7.7% | 59 | 17% |
| American Express | $97.7 | 6 | 8.7% | 75 | $0.0 | 30 | 0.0% | 0 | 0% |
| Synchrony | $97.0 | 7 | 8.6% | 74 | $27.2 | 4 | 12.3% | 152 | 28% |
| Wells Fargo | $51.8 | 8 | 4.6% | 21 | $10.1 | 7 | 4.6% | 21 | 20% |
| Barclays | $31.8 | 9 | 2.8% | 8 | $6.2 | 10 | 2.8% | 8 | |
| Navy Federal Credit Union | $29.4 | 10 | 2.6% | 7 | $5.7 | 11 | 2.6% | 7 | |
| US Bank | $28.6 | 11 | 2.5% | 6 | $4.0 | 12 | 1.8% | 3 | 14% |
| Bread Financial | $19.0 | 12 | 1.7% | 3 | $8.2 | 8 | 3.7% | 14 | 43% |
| Goldman Sachs | $17.4 | 13 | 1.5% | 2 | $6.3 | 9 | 2.9% | 8 | 36% |
| USAA Federal Savings Bank | $16.6 | 14 | 1.5% | 2 | $3.2 | 13 | 1.5% | 2 | |
| TD Bank | $15.3 | 15 | 1.4% | 2 | $3.0 | 14 | 1.4% | 2 | |
| Comenity Capital Bank | $11.0 | 16 | 1.0% | 1 | $2.1 | 15 | 1.0% | 1 | |
| First National Bank of Omaha | $8.1 | 17 | 0.7% | 1 | $1.6 | 16 | 0.7% | 1 | |
| PNC | $7.1 | 18 | 0.6% | 0 | $1.0 | 17 | 0.5% | 0 | 15% |
| Truist | $5.1 | 19 | 0.4% | 0 | $1.0 | 18 | 0.4% | 0 | |
| Merrick Bank | $3.9 | 20 | 0.3% | 0 | $0.8 | 19 | 0.3% | 0 | |
| Citizens Bank | $2.1 | 21 | 0.2% | 0 | $0.4 | 21 | 0.2% | 0 | 20% |
| PenFed Credit Union | $2.1 | 22 | 0.2% | 0 | $0.4 | 22 | 0.2% | 0 | |
| Ally Bank | $2.0 | 23 | 0.2% | 0 | $0.4 | 23 | 0.2% | 0 | |
| Fifth Third | $1.9 | 24 | 0.2% | 0 | $0.1 | 27 | 0.0% | 0 | 4% |
| Regions Financial | $1.4 | 25 | 0.1% | 0 | $0.3 | 24 | 0.1% | 0 | 23% |
| Banco Popular de Puerto Rico | $1.1 | 26 | 0.1% | 0 | $0.2 | 25 | 0.1% | 0 | |
| BMO Harris | $1.0 | 27 | 0.1% | 0 | $0.5 | 20 | 0.2% | 0 | 49% |
| Keycorp | $1.0 | 28 | 0.1% | 0 | $0.1 | 26 | 0.1% | 0 | 11% |
| Huntington Bank | $0.8 | 29 | 0.1% | 0 | $0.0 | 29 | 0.0% | 0 | 4% |
| Santander | $0.3 | 30 | 0.0% | 0 | $0.1 | 28 | 0.0% | 0 | |
| Capital One + Discover | $249.9 | 1 | 22.1% | 490 | $67.3 | 1 | 30.6% | 933 | |
| **Total Loans** | $1,129.0 | | | | $ 220.2 | | | | 19.5% |
| Four-Firm Concentration Ratio | Pre-Merger | 55.4% | | | 62.5% | | | | |
| | Post-Merger | 64.5% | | | 71.6% | | | | |
| HHI | Pre-Merger | 1,100 | | | 1,236 | | | | |
| | Post-Merger | 1,337 | | | 1,626 | | | | |
| | Δ | 237 | | | 390 | | | | |

**Methodology:** Top 30 list of issuers drawn from media reports of top credit card lenders, top banks by assets, top banks by deposits, and nonprime credit card issuers from Consumer Financial Protection Bureau credit card database at CFPB "Terms of Credit Card Plans Survey Results." November 2023. Total outstanding credit card loans by issuer are drawn from 2023 Securities and Exchange Commission Form 10-K, FDIC Call Reports, and annual reports. Market share for total

loans calculated from total outstanding credit card loans from Federal Reserve Bank of New York. Center for Microeconomic Data. Household Debt and Credit Report. Q4 2023. For nonprime credit card loans, 18 firms disclosed the share or volume of outstanding nonprime credit card loans on their SEC filings (primarily for FICO scores under 660, but a few were under 680 or 650). Total outstanding nonprime credit card loans based on the average share of nonprime credit card loans (calculated from the total disclosed nonprime loans divided by total credit card loans from 18 disclosing issuers) multiplied by total outstanding credit card loans. Issuer-specific nonprime credit card loans were calculated from the average for issuers that did not report specific nonprime credit card loans.

---

' JPMorgan Chase & Co. SEC Form 10-K. 2023 at 70 and 247 (FICO <660); Citigroup, Inc. SEC Form 10-K. 2023 at 214 and 216 (<680); Capital One Financial Corp. SEC Form 10-K. 2023 at 90 and 94 (<660); Discover Financial Services. SEC Form 10-K. 2023 at 64 and 102 (<660); Bank of America Corporation. SEC Form 10-K. 2023 at 58 and 117 (<680); American Express National Bank. FDIC Call Report Cert. No. 27471. 2023 (American Express does not make loans to non-prime borrowers); Synchrony Financial. SEC Form 10-K. 2023 at 45 and 132 (<650); Wells Fargo & Co. SEC Form 10-K. 2023 at 119 (<660); Barclays Bank of Delaware. FDIC Call Report Cert. No. 57203, 2023; Navy Federal Credit Union. 2023 Annual Report. 2024 at 37; U.S. Bancorp. SEC Form 10-K. 2023 at 39 (<660 and 88; Bread Financial. SEC Form 10-K. 2023 at F-15 and F-17 (<660); Goldman Sachs Group, Inc. SEC Form 10-K. 2023 at 172; USAA Federal Savings Bank. FDIC Call Report Cert. No. 32188. 2023; TD Bank USA, NA. FDIC Call Report Cert. No. 33947. 2023; TD Bank, NA. FDIC Call Report Cert. No. 18409. 2023; Comenity Capital Bank. FDIC Call Report Cert. No. 57570. 2023; First National Bank of Omaha. FDIC Call Report Cert. No. 5452. 2023; PNC Financial Services Group, Inc. SEC Form 10-K. 2023 at 119 (<660); Truist Financial Corp. SEC Form 10-K. 2023 at 115; Merrick Bank. FDIC Call Repot Cert. No. 34519. 2023; Citizens Bank, NA. FDIC Call Report Cert. No. 57957. 2023; Citizens Financial Group, Inc. SEC Form 10-K. 2023 at 109 (<680, percentage of other retail applied to Call Report credit card loans); PenFed Credit Union. 2022 Annual Report. 2023 at 44; Ally Financial Inc. SEC Form 10-K. 2023 at 79; Fifth Third Bancorp. SEC Form 10-K. 2023 at 91 (<660); Regions Financial Corp. SEC Form 10-K. 2023 at 122; Banco Popular de Puerto Rico. FDIC Call Report Cert. No. 34968. 2023; Bank of Montreal. SEC Form 40-F. 2023 at 163 (share of medium and high-risk credit card loans applied to BMO Bank Call Report credit card loans); BMO Bank NA. FDIC Call Report Cert. No. 16571. 2023; KeyCorp. SEC Form 10-K. 2023 at 125 (<660); Huntington Bancshares Inc. SEC Form 10-K. 2023 at 115 (<650 for other consumer loans applied to Call Report credit card); Huntington Bank. FDIC Call Report Cert. No. 6560. 2023; Santander Bank NA. FDIC Call Report Cert. No. 29950. 2023.