Ryan A. Shores (*pro hac vice*)
David I. Gelfand (*pro hac vice*)
Jacob M. Coate (*pro hac vice*)
CLEARY GOTTLIEB STEEN & HAMILTON LLP
2112 Pennsylvania Ave., NW
Washington, D.C. 20037
202-974-1500
rshores@cgsh.com
dgelfand@cgsh.com
jcoate@cgsh.com

Heather S. Nyong'o (Bar No. 222202)
Matthew M. Yelovich (Bar No. 351330)
CLEARY GOTTLIEB STEEN & HAMILTON LLP
650 California St., Suite 2400
San Francisco, CA 94108
415-796-4400
hnyongo@cgsh.com
myelovich@cgsh.com

*Counsel for Capital One Financial Corporation*

Additional counsel identified on signature page

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

| | |
|---|---|
| Donald Fry, *et al.*,<br><br>    *Plaintiffs,*<br><br>vs.<br><br>Capital One Financial Corporation,<br><br>    *Defendant.* | Case Number: 4:25-cv-03769-HSG<br><br>**DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR APPLICATION FOR AN ORDER TO SHOW CAUSE WHY INJUNCTION SHOULD NOT ISSUE**<br><br>Hon. Haywood S. Gilliam, Jr. |

i

# Table of Contents

ISSUE TO BE DECIDED ........................................................................................ 1

INTRODUCTION ................................................................................................. 1

BACKGROUND .................................................................................................. 4

I.   The Transaction .......................................................................................... 4

II.  Federal banking agencies approve the Transaction. ................................... 4

III. The merger parties prepare to close the Transaction. ................................. 7

IV. Plaintiffs file their Complaint. .................................................................. 7

ARGUMENT ...................................................................................................... 7

I.   Plaintiffs have not established a likelihood of success on the merits. ................... 8

   A.  Plaintiffs have not established Article III standing. ....................... 8

   B.  Plaintiffs have not even attempted to establish a likelihood of success
      under the controlling legal standard. .......................................... 10

      i.   Plaintiffs misrepresent the antitrust standard and ignore the burden-
         shifting framework. ............................................................. 10

      ii.  Plaintiffs have not shown a likelihood that their relevant markets are
         valid. ................................................................................ 12

      iii. Plaintiffs have not shown that they can establish even a *prima facie*
         case in their alleged credit-card market. ................................. 13

      iv. Plaintiffs have not shown that the Transaction will substantially
         lessen competition in payment networks. ................................ 15

II.  Plaintiffs will not suffer irreparable injury without an injunction. ..................... 18

III. The equities and balance of hardships disfavor an injunction. ........................ 20

   A.  Delay would significantly harm Capital One and Discover. ................. 20

   B.  Any harm to Plaintiffs would be comparatively minor. ..................... 22

   C.  Plaintiffs' approach is undeserving of equitable relief. ..................... 23

IV. The public interest disfavors an injunction. ................................................ 24

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

CONCLUSION........................................................................................................ 25

iii

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Bennett v. Isagenix Int'l LLC*,
118 F. 4th 1120 (9th Cir. 2024) ................................................................ 8

*Bradt v. T-Mobile US, Inc.*,
No. 19-CV-07752-BLF, 2020 WL 1809716 (N.D. Cal. Feb. 28, 2020)
.................................................................................................... 2, 14

*Brown Shoe Co. v. United States*,
370 U.S. 294 (1962) ..................................................................... 12–13

*California v. Am. Stores Co.*,
495 U.S. 271 (1990) ............................................................................ 18

*DeHoog v. Anheuser-Busch InBev SA/NV*,
899 F.3d 758 (9th Cir. 2018) ............................................................... 2

*Delco LLC v. Giant of Maryland*,
No. 07-cv-3522, 2007 WL 3307018 (D.N.J. Nov 8, 2007) ..................... 19

*Demartini v. Microsoft Corp.*,
662 F. Supp. 3d 1055 (N.D. Cal. 2023) ........................................... *passim*

*Dimidowich v. Bell & Howell*,
803 F.2d 1473 (9th Cir. 1986) ............................................................. 17

*FTC v. Microsoft Corp.*,
681 F. Supp. 3d 1069 (N.D. Cal. 2023) ............................... 10–11, 15, 20

*FTC v. Tempur Sealy Int'l, Inc.*,
--- F. Supp. 3d ----, 2025 WL 617735 (S.D. Tex. Feb. 26, 2025) ..................... 11, 20

*FTC v. Whole Foods Mkt., Inc.*,
548 F.3d 1028 (D.C. Cir. 2008) ........................................................... 20

*Ginsberg v. INBEV SA/NV*,
No. 08-cv-01375, 2008 WL 4965859 (E.D. Mo. Nov. 18, 2008) ..................... 19, 23

iv

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Hosp. Corp. v. FTC,*
   807 F.2d 1381 (7th Cir. 1986) ............................................................... 13

*JTH Tax, LLC v. Agnant,*
   62 F.4th 658 (2d Cir. 2023) ..................................................................... 8

*Malaney v. UAL Corp.,*
   434 F. App'x 620 (9th Cir. 2011) ................................................. 2, 12, 14

*Malaney v. UAL Corp.,*
   No. 3:10-cv-02858-RS, 2010 WL 3790296 (N.D. Cal. Sept. 27, 2010) ...........*passim*

*Murthy v. Missouri,*
   603 U.S. 43 (2024) ............................................................................... 8–9

*Nat'l Ass'n of Chain Drug Stores v. Express Scripts, Inc.,*
   No. 12-cv-395, 2012 WL 3655459 (W.D. Pa. Aug. 27, 2012) ................................ 19

*St. Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys.,*
   778 F.3d 775 (9th Cir. 2015) ............................................................ 11–14

*Starbucks Corp. v. McKinney,*
   602 U.S. 339 (2024) ............................................................................ 7–8

*Stormans, Inc. v. Selecky,*
   586 F.3d 1109 (9th Cir. 2009) ............................................................... 24

*Taleff v. Sw. Airlines Co.,*
   828 F. Supp. 2d 1118 (N.D. Cal. 2011) ........................................... 2, 19–20

*Taleff v. Sw. Airlines Co.,*
   No. 11-16173, 2013 WL 12581383 (9th Cir. 2013) ................................... 2

*United States v. Aluminum Co.,*
   377 U.S. 271 (1964) .............................................................................. 13

*United States v. AT&T,*
   310 F. Supp. 3d 161 (D.D.C. 2018) ......................................................... 16

*United States v. AT&T,*
   916 F.3d 1029 (D.C. Cir. 2019) ......................................................... 10–11

v

*United States v. Baker Hughes Inc.*,
   908 F.2d 981 (D.C. Cir. 1990) ...................................................................... 11

*United States v. Brewbaker*,
   87 F.4th 563 (4th Cir. 2023) ....................................................................... 17

*United States v. Cont'l Can Co.*,
   378 U.S. 441 (1964) ...................................................................................... 13

*United States v. First Nat'l Bancorporation, Inc.*,
   329 F. Supp. 1003 (D. Colo. 1971) ......................................................... 12–13

*United States v. Gen. Dynamics*,
   415 U.S. 486 (1974) ......................................................................... 2, 13, 14

*United States v. Marine Bancorporation, Inc.*,
   418 U.S. 602 (1974) ...................................................................................... 12

*United States v. Pabst Brewing Co.*,
   384 U.S. 546 (1966) ...................................................................................... 13

*United States v. Phila. Nat'l Bank*,
   374 U.S. 321 (1963) .......................................................................... 11, 12, 16

*United States v. Phillipsburg Nat'l Bank & Tr. Co.*,
   399 U.S. 350 (1970) ............................................................................*passim*

*United States v. Third Nat'l Bank in Nashville*,
   390 U.S. 171 (1968) .............................................................................. 11, 16

*United States v. UnitedHealth Grp., Inc.*,
   630 F. Supp. 3d 118 (D.D.C. 2022) .............................................................. 11

*United States v. Von's Grocery*,
   384 U.S. 270 (1966) ...................................................................................... 13

*W. Airlines, Inc. v. Int'l Brotherhood of Teamsters*,
   480 U.S. 1301 (1987) .................................................................................... 22

*Whalen v. Albertsons*,
   No. 23-cv-00459, 2023 WL 4955141 (N.D. Cal. Aug. 2, 2023) ........................ 2, 9

vi

*Whalen v. Albertsons Cos.*,
   No. 23-cv-00459, 2023 WL 8812882 (N.D. Cal. Dec. 20, 2023) ............................. 9

*Whalen v. Albertsons Cos.*,
   No. 23-cv-00459, 2025 WL 371806 (N.D. Cal. Feb. 3, 2025) .................................. 2

*Yeganeh v. Mayorkas*,
   No. 21-cv-02426, 2021 WL 5113221 (N.D. Cal. Nov. 3, 2021) ........................... 12

**Docketed Cases**

*Bradt v. T-Mobile U.S., Inc.*,
   5:19-cv-7752 (N.D. Cal.) ........................................................................ 23

*Freeland v. Nippon Steel Corp.*,
   5:25-cv-1240 (N.D. Cal.) ........................................................................ 23

*FTC v. Microsoft Corp.*,
   23-15992 (9th Cir.) ........................................................................ 19–20

*Malaney v. UAL Corp.*,
   3:10-cv-2858 (N.D. Cal.) ........................................................................ 23

*Taleff v. Southwest Airlines*,
   3:11-cv-2179 (N.D. Cal.) ........................................................................ 23

*Whalen v. Albertsons Cos. Inc.*,
   3:23-cv-459 (N.D. Cal.) ........................................................................ 23

**Federal Statutes**

12 U.S.C. § 1828 ........................................................................ 4–6, 24

12 U.S.C. § 1842 ........................................................................ 4–5

15 U.S.C. § 18 ........................................................................ 10

15 U.S.C. § 26 ........................................................................ 23

12 U.S.C. § 1843 ........................................................................ 4

**Other Authorities**

12 C.F.R. § 250.182(c) ........................................................................ 6

vii

FDIC Am. Order (Apr. 16, 2025), https://www.fdic.gov/discover-bank-
    enforcement-order.pdf ................................................................................. 25

Fed. R. Civ. P. 65 ......................................................................................... 23

viii

**ISSUE TO BE DECIDED**

Whether the Court should deny Plaintiffs' extraordinary request to preliminarily enjoin Capital One's proposed $48 billion acquisition of Discover after federal banking regulators concluded that the Transaction is in the public interest and will not harm competition and where Plaintiffs have offered *no* supporting evidence to meet their burden.

**INTRODUCTION**

Capital One's $48 billion acquisition of Discover (the "Transaction") is set to close on May 18, 2025.[1] The Transaction was exhaustively investigated for over 13 months by the Board of Governors of the Federal Reserve ("Federal Reserve"), the Office of the Comptroller of the Currency ("OCC"), and the Antitrust Division of the US Department of Justice ("DOJ"). The Federal Reserve and OCC each determined that the Transaction is in the public interest and will not harm competition, and DOJ similarly concluded that it will not challenge the Transaction under the antitrust laws.

The Federal Reserve found that the Transaction will benefit the public in many ways, including by expanding the range of financial products available to Discover customers, offering a higher level of support for low- and moderate-income customers, increasing value for cardholders, and improving Discover's risk-management systems. Capital One has also committed to, post-close, use its considerable resources and risk-management expertise to further Discover's remediation of certain prior bank practices at Discover that are subject to federal enforcement actions.

In an eleventh-hour antitrust challenge, 18 individual, serial Plaintiffs now seek an extraordinary order enjoining the Transaction from closing as scheduled. This hold-up tactic is nothing new. Often using the same group of Plaintiffs here,

---

[1] The acquisition was initially valued at $35 billion. $48 billion is based on the current stock valuation.

Plaintiffs' counsel has filed numerous unfounded strike suits against mergers across a wide array of industries, including airlines, grocery stores, steel, and cell phones. These strike suits have been consistently unsuccessful,[2] and they have resulted in sanctions and judicial frustration with unreasonable arguments. *Taleff v. Sw. Airlines Co.*, No. 11-16173, 2013 WL 12581383 (9th Cir. Mar. 21, 2013) (imposing sanction); *Whalen v. Albertsons Cos.,* No. 23-cv-00459, 2025 WL 371806, at *1 (N.D. Cal. Feb. 3, 2025) (Chhabria, J.) ("At this point, the reader may be asking, 'is this some sort of joke?' It is not. The plaintiffs are actually making these arguments.").

Undeterred by judicial admonitions, the same Plaintiffs, represented by the same counsel, are at it again. Ignoring binding caselaw, they offer the same asked-and-answered antitrust arguments that courts in this District have repeatedly rejected in Plaintiffs' counsel's prior merger challenges. *Demartini v. Microsoft Corp.*, 662 F. Supp. 3d 1055, 1064 (N.D. Cal. 2023) (Corley, J.) (argument "ignores binding Ninth Circuit precedent"); *Malaney v. UAL Corp.*, No. 3:10-cv-02858-RS, 2010 WL 3790296, at *6 (N.D. Cal. Sept. 27, 2010) (Seeborg, J.) ("[M]arket share and the overall concentration level of the industry . . . are 'not conclusive indicators of anticompetitive effects.'" (quoting *United States v. Gen. Dynamics*, 415 U.S. 486, 498 (1974)), *aff'd,* 434 F. App'x 620 (9th Cir. 2011).[3]

---

[2] *E.g.*, *Demartini v. Microsoft Corp.*, 662 F. Supp. 3d 1055 (N.D. Cal. 2023) (Corley, J.) (dismissing); *Bradt v. T-Mobile US, Inc.*, No. 19-CV-07752-BLF, 2020 WL 1809716, at *3 (N.D. Cal. Feb. 28, 2020) (Freeman, J.) (denying injunctive relief); *Malaney v. UAL Corp.*, No. 3:10-cv-02858-RS, 2010 WL 3790296 (N.D. Cal. Sept. 27, 2010) (Seeborg, J.) (denying injunctive relief); *DeHoog v. Anheuser-Busch InBev SA/NV*, 899 F.3d 758 (9th Cir. 2018) (affirming dismissal); *Taleff v. Sw. Airlines Co.*, 828 F. Supp. 2d 1118 (N.D. Cal. 2011) (Ware, J.) (dismissing); *Whalen v. Albertsons*, No. 23-cv-00459, 2023 WL 4955141 (N.D. Cal. Aug. 2, 2023) (Chhabria, J.) (dismissing).

[3] Unless otherwise indicated, internal quotation marks, citations, and alterations have been omitted from quotations.

Plaintiffs' gambit here is even worse, as they ignore that this case is governed by specialized bank-merger statutes that modify the applicable antitrust standard and require the Court to consider not only the merger's competitive impact but also its broader impact on the public interest. *United States v. Phillipsburg Nat'l Bank & Tr. Co.*, 399 U.S. 350, 353, 369–70 (1970). And Plaintiffs offer no proof whatsoever—no declarations from the Plaintiffs, an economist, or anyone else—as to competition or any other consideration supporting the extraordinary relief they seek. *See Malaney*, 2010 WL 3790296, at *5 (plaintiffs must meet burden with a "preponderance of the evidence"). Moreover, Plaintiffs' theories that the Transaction will harm competition in credit cards and credit-card payment networks were squarely rejected by the Federal Reserve. Indeed, the Federal Reserve concluded that if Capital One shifts volume to Discover's network as it plans, it will *deconcentrate* payment networks. Plaintiffs also come nowhere close to establishing the irreparable harm necessary to justify the extraordinary remedy they request. Instead, Plaintiffs offer only bald speculation and consistently rejected legal propositions.

By contrast, as the attached declarations from executives at Capital One and Discover show, any delay in closing would cause extraordinary harm and disruption to the merging parties, their employees, and their shareholders. Capital One and Discover have over a thousand people and dozens of vendors working around the clock to prepare for the May 18, 2025, closing at the cost of hundreds of millions of dollars. The requested injunction would render work wasted, cost the companies tens of millions of dollars (or more), prevent or delay the realization of billions of dollars in merger-related benefits, and disrupt thousands of employees' lives. This would not only harm the merging parties, but it would also deprive the public of the Transaction's many benefits, including the fact that, through the Transaction, Discover will become subject to the more stringent and protective regulatory standards that already govern Capital One as a larger bank.

For these reasons and others, the Court should deny Plaintiffs' Motion.

## BACKGROUND

### I.    The Transaction

In February 2024, Capital One agreed to acquire Discover.[4] A key rationale for the deal was the opportunity for Capital One to acquire and invest in Discover's payment networks. There are four general-purpose credit-card payment networks in the United States: Visa, Mastercard, American Express, and Discover. Compl. ¶ 40. Established in the 1980's, Discover has the smallest share of the four payment networks and has lost share in recent years. Plaintiffs allege that Visa has 52.22% of the market by purchase volume, Mastercard has 24.87%, American Express has 19.46%, and Discover has only 3.46%. Compl. ¶ 40.

Capital One does not own a payment network. Ex. A ("Fed. Order") 15; Ex. B ("Townsend Decl.") ¶ 21. It issues credit and debit cards on Visa's and Mastercard's payment networks. Townsend Decl. ¶ 21. Post-Transaction, Capital One plans to move all its debit-card volume and a significant portion of its credit-card volume to Discover's payment network, bringing scale and resources to the Discover network and making it a better competitor. *See* Fed. Order 15–17; *see* Townsend Decl. ¶¶ 22–24.

### II.    Federal banking agencies approve the Transaction.

Bank mergers like this one are subject to a distinct and finely calibrated statutory framework. Because the Transaction involves an acquisition by a bank-holding company, it required approval from the Federal Reserve under the Bank Holding Company Act. 12 U.S.C. §§ 1842, 1843. Because the Transaction also involves a merger by a national bank, it required approval from OCC under the Bank Merger

---

[4]    Press Release: Capital One to Acquire Discover (Feb. 20, 2024), https://investor.capitalone.com/news-releases/news-release-details/capital-one-acquire-discover.

Act. 12 U.S.C. § 1828. Accordingly, Capital One and Discover sought approval from the Federal Reserve and OCC in March 2024.

The Federal Reserve and OCC each conducted extensive 13-month investigations into the Transaction, involving numerous document and data productions, over a dozen written responses to requests for additional information, more than 6,000 public comments (none from Plaintiffs here), and a public hearing in July 2024. Fed. Order 3. In assessing bank mergers,[5] Congress tasked each agency with considering an array of factors, including the financial and managerial resources and future prospects of the parties, the convenience and needs of the community, the parties' effectiveness at combatting money laundering, and the risk to the stability of the US banking or financial systems. 12 U.S.C. §§ 1828(c)(5), (11), 1842(c)(2), (5), (6), (7).

The Federal Reserve and OCC are also each prohibited from approving a merger "whose effect in any section of the country may be substantially to lessen competition . . . unless [they] find[] that the anticompetitive effects of the proposed transaction are clearly outweighed in the public interest by the probable effect of the transaction in meeting the convenience and needs of the community to be served." 12 U.S.C. §§ 1828(c)(5)(B), 1842(c)(1)(B). It was unnecessary for the agencies to perform this balancing here since they found no lessening of competition, but this is the same standard the Court is required to apply. *Phillipsburg Nat'l Bank*, 399 U.S. at 353.

On April 18, 2025, the Federal Reserve and OCC each approved the Transaction. As explained in the Federal Reserve's 65-page order, the Federal Reserve carefully considered each statutory factor, evaluated the public comments, solicited input from DOJ, OCC, the Federal Deposit Insurance Corporation, and the

---

[5] For simplicity, bank-holding-company mergers and bank mergers are both referred to as "bank mergers" unless otherwise noted.

5

Consumer Financial Protection Bureau, and ultimately approved the Transaction as consistent with federal law and in the public interest. *See* Fed. Order 3–5.

As to competitive effects, the Federal Reserve considered the Transaction's impact on the cluster of services that constitute commercial banking and determined that the merger "would not result in a material increase in concentration in any single banking market." Fed. Order 9–11. The Federal Reserve also considered the Transaction's impact on credit cards and credit-card payment networks. As to credit cards, the Federal Reserve concluded that the Transaction would not harm competition, noting that credit cards are "only moderately concentrated and would remain so after consummation" and that "thousands of competitors would remain." Fed. Order 13. The Federal Reserve likewise concluded that the Transaction will not harm competition in credit-card payment networks, reasoning that Capital One does not currently own a payment network, the combined firm will have a relatively small market share, and if Capital One shifts volume to Discover as planned the Transaction will *deconcentrate* the market and promote competition. Fed. Order 16–17.

Under the Bank Merger Act, DOJ is also tasked with preparing a competitive factors report. 12 U.S.C. § 1828(c)(4). Thus, DOJ also conducted a yearlong comprehensive investigation into the competitive effects of the Transaction. *See* Fed. Order 17. On April 2, 2025, DOJ advised the banking agencies that the Transaction did not warrant an "adverse comment," meaning that DOJ had determined that the Transaction did not have material anticompetitive effects under the antitrust laws. Fed. Order 17; *see* 12 C.F.R. § 250.182(c).

Under the Federal Reserve's order, the Transaction may not close until May 18, 2025. Fed. Order 65. The merger agreement's termination date is May 19, 2025, at which time either party may terminate the Transaction under the agreement's terms. Townsend Decl. ¶ 3.

6

### III.    The merger parties prepare to close the Transaction.

As detailed in declarations from Capital One's and Discover's executives (Exhibits B and C), the merger parties have been working for months on integration-planning at a cost of nearly half a billion dollars. Townsend Decl. ¶ 7 (over $350 million for Capital One); Ex. C ("Werwath Decl.") ¶ 10 (over $112 million for Discover). In fact, over 1,470 employees and contractors have been working around the clock toward a May 18, 2025, closing date. Townsend Decl. ¶ 5 (approximately 500 employees and over 600 contractors for Capital One); Werwath Decl. ¶ 10 (approximately 140 employees and 230 contractors for Discover). Much of this work is time-sensitive, relying on the current state of the merging parties' financials, liquidity, technology systems, and risk-and-compliance status. Townsend Decl. ¶¶ 12–17. Any delay in the closing date would cause some of the work to go stale, costing the merging parties tens of millions of dollars to redo it. Townsend Decl. ¶¶ 12–17.

### IV.    Plaintiffs file their Complaint.

On April 30, 2025, Plaintiffs filed their Complaint, ECF No. 1, and on May 1, 2025, Plaintiffs filed what appears to be a preliminary-injunction motion, styled as an "Order to Show Cause Why Injunction Should Not Issue." ECF No. 5 ("Mot."). Contrary to the determinations of the Federal Reserve, OCC, and DOJ, Plaintiffs challenge the Transaction under Section 7 of the Clayton Act, arguing that the Transaction will substantially lessen competition in credit cards and credit-card payment networks. Mot. 1–2.

### ARGUMENT

A preliminary injunction is an "extraordinary equitable remedy that is never awarded as of right." *Starbucks Corp. v. McKinney*, 602 U.S. 339, 345 (2024). Plaintiffs must make a "clear showing" that (1) they are likely to succeed on the merits, (2) they will suffer an irreparable injury without injunctive relief, (3) the

equities favor an injunction, and (4) an injunction is in the public interest. *Id.* at 346. Ninth Circuit precedent also permits Plaintiffs to obtain a preliminary injunction if they can establish "serious questions going to the merits," that the equities "*sharply*" favor Plaintiffs, that they will suffer irreparable harm, and that the injunction is in the public interest. *Bennett v. Isagenix Int'l LLC*, 118 F. 4th 1120, 1126 (9th Cir. 2024). *But see Starbucks*, 602 U.S. at 349–50 (rejecting similar standard). Plaintiffs have not satisfied either standard, offering no evidence and ignoring applicable law.

Plaintiffs' preliminary injunction risks permanently depriving the public of the Transaction's benefits if the merger is terminated. So, Plaintiffs' burden is even higher. *JTH Tax, LLC v. Agnant*, 62 F.4th 658, 668 (2d Cir. 2023). The merger agreement's termination date is less than two weeks away. *See* Townsend Decl. ¶ 3. Yet Plaintiffs seek an injunction lasting until the court can hold a trial on the merits, which Plaintiffs predict will occur sometime in 2026. Mot. 15.

## I.  Plaintiffs have not established a likelihood of success on the merits.

Plaintiffs' Motion fails to acknowledge or address the relevant standard governing this merger, recycles frequently rejected antitrust arguments, and suffers from a complete failure of proof. Their case has no chance of success.

### A.  Plaintiffs have not established Article III standing.

As an initial matter, Plaintiffs must establish that they will suffer "an injury that is concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Murthy v. Missouri*, 603 U.S. 43, 57 (2024). "[S]tanding is not dispensed in gross," so each plaintiff must establish standing for each claim. *Id.* at 61. Importantly, private antitrust plaintiffs must establish how the merger will affect them personally—claims that the merger will harm competition or the public generally are not enough. *See Demartini v. Microsoft Corp.*, 662 F. Supp. 3d 1055, 1061 (N.D. Cal. 2023).

Plaintiffs have offered no evidence establishing that they are likely to be harmed in any way by the Transaction. They have offered no evidence establishing that they own credit cards, what credit cards they own, what other credit cards are available to them, how often they use such cards, what payment networks those cards are on, etc. Even the Complaint, which is not evidence, merely lists out the 18 Plaintiffs without making any allegations as to any individual Plaintiff, asserting a single set of allegations for all 18. Compl. ¶ 9; *cf. Murthy*, 603 U.S. at 61 ("[S]tanding is not dispensed in gross."). It then asserts that they "have various credit and debit cards including Capital One and Discover" and that "their consumer choice will be eliminated, prices and rates may be increased, rewards may be lowered or eliminated, and the quality of services may be decreased, and the benefits of competition will be substantially and adversely impacted if not completely eliminated." Compl. ¶ 9.

Less than two years ago, a court in this District dismissed these same 18 Plaintiffs for lack of Article III standing on similar allegations, concluding that plaintiffs "have made no effort to explain how the merger would affect any one of them personally, in the area where they live and shop." *Whalen v. Albertsons*, No. 23-cv-00459, 2023 WL 4955141, at *1 (N.D. Cal. Aug. 2, 2023). After the plaintiffs in that case amended their complaint to allege that the merger could cause them to pay higher grocery prices, the court again dismissed their claims for lack of Article III standing, reasoning that "plaintiffs say nothing about whether (and how many) alternative grocery store options exist in the areas where they could realistically be expected to shop" and nothing about how often plaintiffs shopped at the merging parties. *Whalen v. Albertsons Cos.*, No. 23-cv-00459, 2023 WL 8812882 (N.D. Cal. Dec. 20, 2023). Plaintiffs are missing that same evidence here: they have not established what credit cards are available to them, how frequently they use Capital One or Discover cards, or how this merger will concretely impact them.

Even as to this basic element of Article III standing, Plaintiffs offer no evidence at all.

**B.      Plaintiffs have not even attempted to establish a likelihood of success under the controlling legal standard.**

Plaintiffs assert a claim under Section 7 of the Clayton Act, which prohibits mergers likely to substantially lessen competition. 15 U.S.C. § 18; *see* Compl. ¶106. But in this case, the Bank Merger Act and Bank Holding Company Act also apply, requiring the court to balance any competitive harm with the merger's benefits to the public. *Phillipsburg Nat'l Bank*, 399 U.S. at 353, 369–70.

Thus, Plaintiffs' claim is assessed under a two-step process. *Id.* First, Plaintiffs must establish a Section 7 violation. *Id.* This requires them to establish that the Transaction is likely to substantially lessen competition in a valid relevant market. *Id.* Second, even then, the Transaction may still proceed if the benefits to the public outweigh any harm to competition. *Id.*

Plaintiffs never even mention this legal framework, much less establish that they will likely succeed under it. In any event, Plaintiffs do not get past step one: they fail to demonstrate a likelihood of success on the antitrust question of whether this merger substantially lessens competition.

**i.      Plaintiffs misrepresent the antitrust standard and ignore the burden-shifting framework.**

Contrary to Plaintiffs' uncited assertion, they do not face an "exceptionally low" burden to establish harm to competition. Mot. 9; see *Demartini,* 662 F. Supp. 3d at 1064 (rejecting similar argument from Plaintiffs' counsel as "ignor[ing] their pleading burden and Supreme Court law"). Rather, Plaintiffs must establish by a preponderance of the evidence that there is a "reasonable probability" that the merger will "substantially" lessen competition. *FTC v. Microsoft Corp.*, 681 F. Supp. 3d 1069, 1083–84 (N.D. Cal. 2023). Put differently, the harm must be *likely*; a "mere

10

possibility" is not enough. *United States v. AT&T*, 916 F.3d 1029, 1032 (D.C. Cir. 2019); *United States v. UnitedHealth Grp., Inc.*, 630 F. Supp. 3d 118, 129 (D.D.C. 2022); *FTC v. Tempur Sealy Int'l, Inc.*, --- F. Supp. 3d ----, 2025 WL 617735, at *12 (S.D. Tex. Feb. 26, 2025). Moreover, it must be *substantial*; merely showing that *some* harm would occur is not enough. *Microsoft*, 681 F. Supp. 3d at 1090; *Tempur Sealy,* 2025 WL 617735, at *12; *UnitedHealth*, 630 F. Supp. 3d at 129.

Courts consider whether plaintiffs have met their burden under these standards through a long-established burden-shifting framework. *St. Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys.*, 778 F.3d 775, 783 (9th Cir. 2015); *Microsoft*, 681 F. Supp. 3d at 1084; *United States v. Baker Hughes Inc.*, 908 F.2d 981, 982–83 (D.C. Cir. 1990). Under this framework, the plaintiff must first make a *prima facie* case by showing that the merger is likely to substantially lessen competition in a properly defined antitrust market. *St. Alphonsus*, 778 F.3d at 783. The defendant must then produce evidence rebutting the *prima facie* case. *Id.* The plaintiff must then produce additional evidence of anticompetitive harm. *Id.* Plaintiffs fail to acknowledge this Section 7 framework.

Plaintiffs also fail to address the Bank Holding Company Act and Bank Merger Act, which require the Court to consider the Transaction's impact on the public interest. In fact, Plaintiffs urge the Court to disregard the Transaction's procompetitive benefits, citing *Philadelphia National Bank*, 374 U.S. 321, 370 (1963). Mot. 12–13. This ignores the fact that Congress amended the Bank Merger Act and Bank Holding Company Act in 1966 to overturn that part of *Philadelphia National Bank* and require courts to consider a bank merger's benefits to the public. *United States v. Third Nat'l Bank in Nashville*, 390 U.S. 171, 177 (1968).

11

1

2

> ii.     **Plaintiffs have not shown a likelihood that their relevant markets are valid.**

Under the burden-shifting framework that Plaintiffs ignore, they must first establish a valid relevant market in which to judge the Transaction's competitive effects. *United States v. Marine Bancorporation, Inc.*, 418 U.S. 602, 618 (1974); *St. Alphonsus*, 778 F.3d at 783. The failure to do so is itself "fatal." *Malaney,* 2010 WL 3790296, at *12 (denying injunction in merger challenge brought by Plaintiffs' counsel and 17 of the same Plaintiffs here for failure to establish a relevant market), *aff'd*, 434 F. App'x 620 (9th Cir. 2011).

"The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962). In defining markets, courts also apply the *Brown Shoe* practical indicia, which include: "industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Id.*

Here, Plaintiffs simply assert that the relevant markets are general-purpose credit cards and credit-card payment networks. *See* Mot. 4. But they never develop any argument or cite any law to support that assertion. *See Yeganeh v. Mayorkas*, No. 21-cv-02426, 2021 WL 5113221, at *10 (N.D. Cal. Nov. 3, 2021) (undeveloped arguments are deemed abandoned).

In fact, in every bank-merger case reviewed by the Supreme Court, it has defined the relevant product market as the cluster of services that constitute commercial banking. *E.g.*, *Marine Bancorporation*, 418 U.S. at 618–19, n.16 (collecting cases). "Since *Philadelphia National Bank* the Supreme Court has . . . stated in no uncertain terms that commercial banking is the relevant line of commerce." *United States v. First Nat'l Bancorporation, Inc.*, 329 F. Supp. 1003,

1011–12 (D. Colo. 1971), *aff'd*, 410 U.S. 577 (1973). The banking regulators have done the same, including in this case. Fed. Order 9–10.

Plaintiffs fail to explain why this case requires a departure from the market definition consistently applied by courts and banking regulators, nor do they offer any evidence in support of their proposed markets. For this reason alone, the Court should conclude that Plaintiffs have no likelihood of success.

### iii.    Plaintiffs have not shown that they can establish even a *prima facie* case in their alleged credit-card market.

Even if they could get past the market-definition step, Plaintiffs' Section 7 claim would fail. With respect to the alleged credit-card market, Plaintiffs' sole argument is that Capital One and Discover are credit-card competitors and that "any nontrivial acquisition of a competitor" is supposedly automatically illegal under Section 7. Mot. 11–12. For support, Plaintiffs cite a handful of Supreme Court merger cases from the 1960's and one Seventh Circuit case. Mot. 10–12.[6] But under more recent, binding Supreme Court and Ninth Circuit caselaw, statistics about market share or concentration are not enough to establish a violation. *United States v. Gen. Dynamics*, 415 U.S. 486, 498 (1974); *St. Alphonsus*, 778 F.3d at 785–86.

Indeed, as courts in this District keep explaining to Plaintiffs' counsel, the contention "that any non-trivial acquisition of a significant rival is per se violative of the Clayton Act is wrong." *Malaney*, 2010 WL 3790296, at *7. For example, in *Malaney*, Plaintiffs' counsel (and 17 of the 18 Plaintiffs here) raised the exact same argument citing the exact same cases. *Id.* at *6–7. Judge Seeborg rejected that argument as both a misreading of the cited cases and as foreclosed by Supreme Court precedent, which makes clear that "market share statistics alone are not conclusive

---

[6] *Brown Shoe Co. v. United States*, 370 U.S. 294 (1962); *United States v. Cont'l Can Co.*, 378 U.S. 441 (1964); *United States v. Aluminum Co.*, 377 U.S. 271 (1964); *United States v. Von's Grocery*, 384 U.S. 270 (1966); *United States v. Pabst Brewing Co.*, 384 U.S. 546 (1966); *Hosp. Corp. v. FTC*, 807 F.2d 1381 (7th Cir. 1986).

13

indicators of anticompetitive effects." *Id.* (citing *Gen. Dynamics*, 415 U.S. at 498). The Ninth Circuit affirmed. 434 F. App'x 620 (9th Cir. 2011).

Plaintiffs' counsel also tried the same gambit in *Demartini*, again arguing that any "non-trivial" "elimination of a rival" was automatically illegal. 662 F. Supp. 3d at 1064–65. As here, Plaintiffs' counsel relied on *Hospital Corp.* and urged the court to ignore Ninth Circuit precedent because "Ninth Circuit law conflicts with the United States Supreme Court merger cases from the 1960's." *Id.* Judge Corley rejected these arguments, concluding that they "ignore[d] binding Ninth Circuit precedent" and had already been rejected in *Malaney. Id.*; *see Bradt*, 2020 WL 1233939, at *4 (rejecting Plaintiffs' counsel's argument that *Hospital Corp.* "establishes the illegality of any nontrivial acquisition of a competitor").

To be sure, with a properly defined market and reliable evidence of shares, a plaintiff can establish a rebuttable *prima facie* case by "showing high market share," such as an increase in the HHI of "more than 200 points" that results in a "highly concentrated market[]," meaning those with an HHI above 2500. *St. Alphonsus*, 778 F.3d at 785–86; *accord Bradt*, 2020 WL 1809716, at *2. But in their Motion, Plaintiffs do not advance this argument. In fact, Plaintiffs do not introduce any economic evidence of shares or concentration at all, much less evidence that would satisfy a *prima facie* case. Instead, the Complaint, which is not evidence, alleges that the Transaction will increase the HHI by about 76 points for a total of about 1,747, Compl. ¶ 37, well under the threshold required to get past even the first step of the burden-shifting framework.[7]

This failure to develop coherent analysis or provide evidence or expert declarations is standard practice for Plaintiffs and their counsel. As Judge Chhabria explained to Plaintiffs' counsel in *Whalen*: "You just say over and over again [that these two firms] are merging, and then you block-quote over and over again these

---

[7] The HHIs asserted in the Complaint are also inaccurate and artificially inflated.

14

Supreme Court cases from the '60s. I mean, you've provided no evidence. You've provided no analysis. You've provided no declaration from an expert about the effect that this will have on competition. . . . I'm not sure I've ever seen such a weak presentation." Hearing Tr. 16:18–17:2, No. 3:23-cv-00459-VC (Aug. 2, 2023), ECF No. 90.

Here, too, Plaintiffs have failed to offer any evidence that the Transaction will harm competition in credit cards.

### iv. Plaintiffs have not shown that the Transaction will substantially lessen competition in payment networks.

Plaintiffs also challenge Capital One's proposed vertical acquisition of Discover's payment network. To successfully challenge this vertical integration, Plaintiffs "must make a fact-specific showing that the proposed merger is likely to be anticompetitive." *Microsoft*, 681 F. Supp. 3d at 1084. This is a heavy burden: "vertical integration is ubiquitous in our economy and virtually never poses a threat to competition when undertaken unilaterally and in competitive markets." *Id.* at 1088.

Plaintiffs assert that the Transaction will "eliminate" Discover as a payment-network competitor. Mot. 1, 2, 5. That is false. As Plaintiffs elsewhere concede, the Discover network is fundamental to the Transaction's rationale, and the Discover network will continue to exist post-Transaction. Compl. ¶¶ 75–79; *see* Townsend Decl. ¶¶ 22–24. It will simply be owned by Capital One instead of Discover.

Contrary to Plaintiffs' irrational speculation, the Federal Reserve has already concluded that the Transaction will not harm competition in credit-card payment networks and will instead deconcentrate the industry. Fed. Order 16–17. Moreover, as Plaintiffs acknowledge, Discover has, by far, the smallest share (3.46%) of the four credit-card payment networks. Compl. ¶ 40. Post-Transaction, Capital One plans to shift all its debit-card volume and a significant portion of its credit-card volume to Discover's payment networks, thus enhancing Discover's scale and making it a

15

stronger competitor against Visa and Mastercard. Townsend Decl. ¶¶ 22–24. Capital One also plans to make significant investments in Discover's payment network, improving its anti-fraud capabilities and international acceptance. Townsend Decl. ¶¶ 22–24. Plaintiffs have introduced no evidence casting doubt on any of these benefits.

Citing *Philadelphia National Bank*, Plaintiffs suggest that the Court must close its eyes to the Transaction's benefits. *See* Mot. 12–13. But Plaintiffs miss the fact that Congress amended the Bank Merger Act and Bank Holding Company Act in 1966 to specifically overturn this part of *Philadelphia National Bank*, *Third Nat'l Bank*, 390 U.S. at 177, and to ensure that a court considers a bank merger's benefit to the public, *Phillipsburg Nat'l Bank*, 399 U.S. at 353, 369–70. These benefits include "enhancing" the acquired entity's "competitive position." *Phillipsburg*, 399 U.S. at 367 (explaining this is "certainly relevant in determining the convenience and needs of the community under the Bank Merger Act").

Further, the Transaction will allow Capital One to vertically integrate with a payment network. Vertical integration has well-recognized procompetitive benefits. *United States v. AT&T*, 310 F. Supp. 3d 161, 193 (D.D.C. 2018). It is not feasible for Capital One to create its own payment network. Indeed, the Complaint alleges that Visa and Mastercard "have the market power to prevent entry," and even if they did not, indirect network effects pose "near insurmountable barriers to entry." Compl. ¶¶ 87, 91–92.

Plaintiffs also claim that there is something inherently anticompetitive about the fact that, post-Transaction, Capital One will both operate Discover's network and continue to issue some cards on Visa's and Mastercard's networks. Mot. 2 ("per se collaborators"). Not so. This is called a "dual-distribution" arrangement, where firms distribute their own products and also distribute through other firms. *United States v. Brewbaker*, 87 F.4th 563, 581 (4th Cir. 2023). Post-Transaction, Capital One will

16

issue its credit-card lending services both through its own payment network (Discover) and through Visa's and Mastercard's payment networks. Dual distribution is common in the credit-card industry and other industries. *See* Compl. ¶ 80 (noting that American Express is a network for US Bank and other card issuers, but American Express also competes against those same companies as a card issuer).

Far from being inherently suspect, as Plaintiffs argue, such arrangements are often procompetitive because they improve "distributive efficiency," increase "consumer reach," and promote "interbrand competition." *Brewbaker*, 87 F.4th at 580–81. Unsurprisingly, the Ninth Circuit has long held that dual-distribution arrangements are not *per se* illegal. *See Dimidowich v. Bell & Howell*, 803 F.2d 1473, 1481 (9th Cir. 1986). And *per se* argument aside, Plaintiffs have introduced no evidence showing that the post-Transaction dual-distribution system here is likely to lessen competition.

\*       \*       \*

Plaintiffs ignore the controlling legal standard, offer antitrust arguments that have repeatedly been rejected, and proffer no evidence to meet their burden— instead attaching a handful of letters (which are not evidence) expressing concern about the merger. The Federal Reserve, OCC, and DOJ considered all the arguments for and against the merger, including those in the letters Plaintiffs attach. Based on a massive evidentiary record and their regulatory expertise, those agencies, which are responsible for the stability and competitiveness of the banking system, found no competitive concern and that the merger is in the public interest. Plaintiffs have offered nothing to call those findings into question or any reason to think they have any chance of succeeding on the merits. For this reason alone, Plaintiffs' Motion should be denied.

## II.     Plaintiffs will not suffer irreparable injury without an injunction.

Citing Justice O'Connor's decision staying the mandate in *California v. American Stores*, Plaintiffs insist that any showing of a "lessening of competition" automatically qualifies as an irreparable injury warranting a preliminary injunction without any individualized showing as to Plaintiffs themselves. Mot. 7, n.3, 14 (citing 492 U.S. 1301, 1304 (1989)). But Plaintiffs omit that later in that very case the Supreme Court made clear that this is only true of *government* plaintiffs. *California v. Am. Stores Co.*, 495 U.S. 271, 296 (1990) ("In a Government case the proof of the violation of law may itself establish sufficient public injury to warrant relief. A private litigant, however, must have standing—in the words of § 16, he must prove 'threatened loss or damage' to his own interests in order to obtain relief."). Thus, as Judge Seeborg held in rejecting another of Plaintiffs' merger challenges: "In evaluating plaintiffs' purported irreparable harm . . . the Court must only consider those injuries plaintiffs advance that are personal to them were defendants to merge, and cannot consider any injuries that plaintiffs allege would be suffered by the . . . public as a whole." *Malaney*, 2010 WL 3790296, at *13; *see also Demartini,* 2023 WL 3569993, at *3 (rejecting the same argument Plaintiffs raise here); *Bradt*, 2020 WL 1233939, at *4 (same).

As to Plaintiffs individually, they vaguely assert without evidence or even rough calculation that they "fear" "their choice will be eliminated, prices and rates may be increased, rewards may be lowered or eliminated, and the quality of the services may be decreased, and the benefits of competition will be substantially and adversely impacted if not completely eliminated." Mot. 13. This string of antitrust buzzwords is far too conclusory to state a claim, much less carry Plaintiffs' heavy burden to demonstrate irreparable harm. *See Demartini*, 662 F. Supp. 3d at 1062 (dismissing as "insufficient" Plaintiffs' counsel's "general allegation that the merger may cause 'higher prices, less innovation, less creativity, less consumer choice,

decreased output, and other potential anticompetitive effects'"). "Bare allegations . . . are insufficient to establish irreparable injury." *Ginsberg v. INBEV SA/NV*, No. 08-cv-01375, 2008 WL 4965859, at *5 (E.D. Mo. Nov. 18, 2008) (denying Plaintiffs' counsel's requested injunction). Again, Plaintiffs must do more than "merely allege" an irreparable injury, they must "*demonstrate*" such injury. *Demartini*, 2023 WL 3569993, at *2.

In any event, Plaintiffs' predicted injuries of increased "prices and rates," lowered "rewards," "potential losses," and "damages" are all economic and would not be irreparable. Mot. 13; Compl. ¶ 115. For example, in *Taleff v. Southwest Airlines Co.*, Plaintiffs' counsel—and 17 of the 18 Plaintiffs here—sought an injunction as to an airline merger, claiming that it would cause higher prices. 828 F. Supp. 2d 1118, 1123 (N.D. Cal. 2011). Judge Ware dismissed the claim, in part because higher prices do not qualify as an irreparable injury justifying equitable relief. *Id.*; *see Malaney*, 2010 WL 3790296, at *12–13 (denying preliminary injunction sought by Plaintiffs' counsel in similar circumstances). Likewise, in *Delco LLC v. Giant of Maryland*, the court rejected the plaintiffs' effort to block a grocery-store merger, reasoning that the claimed injuries of higher prices and longer drive times were not irreparable. No. 07-cv-3522, 2007 WL 3307018, at *19 (D.N.J. Nov. 8, 2007). And, in *Nat'l Ass'n of Chain Drug Stores v. Express Scripts, Inc.*, the court rejected the plaintiffs' attempt to block a pharmaceutical merger, holding that the claimed injury of higher prices was not irreparable. No. 12-cv-395, 2012 WL 3655459 (W.D. Pa. Aug. 27, 2012).

Moreover, Plaintiffs must demonstrate an "immediate" threatened injury to obtain a preliminary injunction. *Demartini*, 2023 WL 3569993, at *2. Plaintiffs have demonstrated no injury at all, much less one sufficiently "immediate" that would warrant preventing the merger from closing before the May 19, 2025, termination date. Post-close merger litigation is not unusual, including for Plaintiffs' counsel. *FTC v. Microsoft Corp.*, No. 23-15992 (9th Cir.) (ongoing post-close challenge); *Taleff*, 828

F. Supp. 2d 1118 (post-close merger challenge by Plaintiffs' counsel); *FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028 (D.C. Cir. 2008) (post-close challenge).

**III.    The equities and balance of hardships disfavor an injunction.**

Capital One and Discover executed their merger agreement in February 2024. The merger agreement's May 19, 2025, termination date is fast approaching.

The outside date "is quite clearly a core term of the acquisition itself." *Tempur Sealy,* 2025 WL 617735, at *54. "Corporations have responsibilities to their shareholders, employees, and customers. Major structural shifts cannot remain in limbo for prolonged or indefinite periods of time." *Id.*; *see Microsoft*, 681 F. Supp. 3d at 1084–85 ("[T]he issuance of a preliminary injunction blocking an acquisition or merger may prevent the transaction from ever being consummated."). But even putting aside the risk to the deal itself, delay will substantially harm Capital One and Discover, vastly outweighing any theoretical harm to Plaintiffs.

**A.    Delay would significantly harm Capital One and Discover.**

Capital One Managing Vice President Paul Townsend's Declaration details the potential harm to Capital One. Ex. B. Integrating two companies of this size and complexity is an enormous effort. Townsend Decl. ¶ 5. Accordingly, Capital One has been involved in integration planning for 14 months, utilizing a team of approximately 500 Capital One associates (who spend at least 75% of their time on integration planning) and over 600 contractors. Townsend Decl. ¶ 5. Post-close, integration will continue for another two years, as Capital One works to integrate many complicated systems. Townsend Decl. ¶ 6.

Capital One has already spent over $350 million on integration preparation and current integration efforts are costing Capital One over $40 million per month as it prepares to close in advance of the May 19, 2025, termination date. Townsend Decl. ¶ 7. Even a small delay would cost Capital One tens of millions of dollars because Capital One would need to maintain the ability to execute closing consistent with the

20

safety and soundness expectations of Capital One's banking regulators. Townsend Decl. ¶ 9. So, even an "idling" state would result in significant productivity losses and tens of millions of dollars in extra expense. Townsend Decl. ¶ 8.

Moreover, much of Capital One's preparatory work is time-sensitive and tied to a May 18 closing date, including Capital One's ability to report consolidated financials and meet regulatory requirements, its creation of a consolidated risk-management program, its compliance with the Federal Reserve's order, its cybersecurity preparation, and its organizational planning. Townsend Decl. ¶¶ 12–16. Any delay would necessitate a do-over at significant cost to Capital One. Townsend Decl. ¶ 17. Such a do-over would also take time given the need to retrain integration team members after delay. Townsend Decl. ¶ 10.

A preliminary injunction would also harm Capital One's employees. Hundreds of employees have moved out of their other roles and onto integration teams, where they expect to work for the next two years. Townsend Decl. ¶ 11. A delay would disrupt their lives. *Id.*

Further, post-close, Capital One plans to migrate billions of dollars of volume to Discover's network and to invest in improving Discover's network. Townsend Decl. ¶¶ 22–23. It also expects to achieve billions of dollars in synergies by 2027. Townsend Decl. ¶ 20. Plaintiffs' proposed injunction would delay Capital One's migration efforts and those synergies. Townsend Decl. ¶¶ 20, 25. This will harm not only Capital One and Discover but also payment-network competition and Capital One's customers and shareholders. Townsend Decl. ¶ 24.

The potential harm to Discover is similarly staggering and is outlined in Discover Executive Vice President Karl Werwath's Declaration (Ex. C). Discover, too, has been fully engaged in integration planning. Discover has approximately 140 employees and 230 contractors working on integration. Werwath Decl. ¶ 10. It has spent approximately $112 million on integration-related activities and since January

2025, has been averaging approximately $10 million per month. Werwath Decl. ¶¶ 10–11. As with Capital One, any delay in closing would cost Discover millions of dollars. Werwath Decl. ¶ 14.

Any delay will throw Discover's employees into uncertainty. Already, Discover has experienced attrition from the merger, including at senior levels. Werwath Decl. ¶ 15. Although Discover has expended considerable resources (approximately $97 million) to retain top talent, Plaintiffs' requested injunction would make it even more costly for Discover to continue to do so. Werwath Decl. ¶ 16. Further, delay would create anxiety and uncertainty for Discover's employees. Werwath Decl. ¶ 17.

These harms weigh heavily against Plaintiffs' requested injunction. In *Malaney*, for example, Judge Seeborg rejected another of Plaintiffs' counsel's merger challenges, in part because "delaying the merger would result, among other things, in the loss of significant revenue synergies and cost savings, in their continued vulnerability to exogenous shocks that a merged entity could withstand, in threatened job security for tens of thousands of employees who will benefit from a more stable employer, and in the continued deferral of capital and technology investments." 2010 WL 3790296, at *14. Similarly, as Justice O'Connor explained in staying a Ninth Circuit order enjoining a merger: "The cost of enjoining this huge undertaking [shortly] before its long awaited consummation is simply staggering in its magnitude, in the number of lives touched and dollars lost. To assume that enjoining of the merger would do no more than preserve the status quo, in the face of this upheaval, would be to blink at reality." *W. Airlines, Inc. v. Int'l Bhd. of Teamsters*, 480 U.S. 1301, 1309 (1987).

## B.    Any harm to Plaintiffs would be comparatively minor.

Plaintiffs' alleged harm pales in comparison. As with irreparable injury, in evaluating the balance of equities, "the Court must only consider those injuries plaintiffs advance that are personal to them were defendants to merge, and cannot

22

consider any injuries that plaintiffs allege would be suffered by the general [public] as a whole." *Malaney*, 2010 WL 3790296, at *13. Plaintiffs have offered no evidence quantifying their predicted harms. But common sense suggests that the maximum possible damages relating to higher credit-card fees or lower rewards for 18 individual cardholders is not likely to even register on the equities scale, much less "tilt" it in Plaintiffs' direction, considering the harm an injunction would cause to the merger parties and the public.

### C.     Plaintiffs' approach is undeserving of equitable relief.

As discussed, Plaintiffs' counsel's *modus operandi* is to file strike suits—often with virtually the same group of Plaintiffs here—against pending mergers at the precise moment when they would cause the most disruption.

| Case | Plaintiff Overlap |
|---|---|
| *Freeland v. Nippon Steel Corp.*, 5:25-cv-1240 (N.D. Cal. 2025) | 16 of 18 |
| *Whalen v. Albertsons Cos. Inc.*, 3:23-cv-459 (N.D. Cal. 2023) | 18 of 18 |
| *Bradt v. T-Mobile U.S., Inc.*, 5:19-cv-7752 (N.D. Cal. 2019) | 14 of 18 |
| *Taleff v. Southwest Airlines*, 3:11-cv-2179 (N.D. Cal. 2011) | 17 of 18 |
| *Malaney v. UAL Corp.*, 3:10-cv-2858 (N.D. Cal. 2010) | 17 of 18 |

And as noted, Plaintiffs' counsel's strike suits have been consistently unsuccessful, and resulted in sanctions and admonitions. *See supra* at n. 2.

Against this backdrop, Plaintiffs' insistence that they need not post a bond, Mot. 16—as the Clayton Act (15 U.S.C. § 26) and Federal Rule of Civil Procedure 65 presumptively require—further tilts the equities in Capital One's favor. *Ginsberg*, 2008 WL 4965859, at *5 (relying on the failure to post a bond in rejecting another of Plaintiffs' counsel's merger challenges). The costs of wrongful delay to Capital One and Discover would not be recoverable.

**IV.    The public interest disfavors an injunction.**

In considering whether Plaintiffs have met their burden to establish that an injunction is in the public interest, "the district court should give due weight to the serious consideration of the public interest . . . that has already been undertaken by the responsible [government] officials." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1140 (9th Cir. 2009). Here, the Federal Reserve and OCC—the expert regulators responsible for the health and stability of the national banking system—determined, after an extensive review, that the Transaction is consistent with the public interest.

Those agencies considered a litany of public-interest factors, including "the financial and managerial resources and future prospects of the existing and proposed institutions, the convenience and needs of the community to be served, and the risk to the stability of the United States banking or financial system." 12 U.S.C. § 1828(c)(5)(B). Both the Federal Reserve and OCC concluded that the Transaction "would allow Capital One to expand the range of financial products and services available through [Discover]" and "increase value for cardholders." *See* Fed Order 11, 16–17, 63–64; OCC Order 3 (Ex. D). The Federal Reserve also conducted an extensive review of the merging parties' performance under the Community Reinvestment Act ("CRA"), noting that (1) Capital One's rating is "Outstanding," compared to Discover's "Satisfactory" rating, (2) Capital One "will have a comprehensive risk-management system and compliance culture that is better able to serve its customers," and (3) the combined firm's CRA program will result in "a higher level of support for [low- and moderate-income] consumers and neighborhoods and small businesses." Fed. Order 23, 36, 48, 51.

Simultaneously with the announcement of the approvals, the Federal Reserve and the FDIC announced consent orders against Discover for improperly charging merchants over $1 billion in credit-card interchange fees. As a condition of the Transaction's approval, Capital One has committed to provide a remediation plan to

OCC within 120 days of consummation, *see* OCC Order 5, and to comply with the obligations of the Federal Reserve's consent order against Discover, *see* Fed. Order 23. Plaintiffs' sought injunction would delay Capital One's ability to further Discover's ongoing efforts to remediate what the FDIC determined were "unsafe or unsound banking practices" at Discover.[8] Notably, through the Transaction, Discover will also become subject to the more stringent and protective standards that already govern Capital One as a larger bank. OCC Order, App'x 8.

Moreover, as discussed, the uncertainty that would be caused by the requested injunction would disrupt business planning and fuel employee attrition in an industry in which the risks associated with instability are grave and could reverberate across the banking and financial sector.

Plaintiffs grapple with none of this and thus do not come close to meeting their burden.

## CONCLUSION

Plaintiffs seek extraordinary relief with an extraordinary lack of evidence. Expert banking regulators have already concluded that the Transaction will not harm competition and will benefit the public. But those public benefits could be lost and Capital One and Discover will be irreparably injured if Plaintiffs are successful in running out the clock on the Transaction or delaying its implementation.

For the foregoing reasons, this Court should deny Plaintiffs' Motion. Capital One respectfully requests that the Court do so as soon as practicable given the fast-approaching termination date and the need for an orderly closing.

Dated: May 6, 2025

*/s/ Ryan A. Shores*
Ryan A. Shores (*pro hac vice*)
David I. Gelfand (*pro hac vice*)
Jacob M. Coate (*pro hac vice*)

---

[8] *See* FDIC Am. Order (Apr. 16, 2025), https://www.fdic.gov/discover-bank-enforcement-order.pdf.

25

CLEARY GOTTLIEB STEEN & HAMILTON
LLP
2112 Pennsylvania Ave., NW
Washington, D.C. 20037
202-974-1500
rshores@cgsh.com
dgelfand@cgsh.com
jcoate@cgsh.com

Heather S. Nyong'o (Bar No. 222202)
Matthew M. Yelovich (Bar No. 351330)
CLEARY GOTTLIEB STEEN & HAMILTON
LLP
650 California St., Suite 2400
San Francisco, CA 94108
415-796-4480
hnyongo@cgsh.com
myelovich@cgsh.com

*/s/ Adam L. Goodman*
Adam L. Goodman (*pro hac vice*)
Wachtell, Lipton, Rosen & Katz
51 W. 52nd St.
New York, NY 10019
212-403-1000
algoodman@wlrk.com

*Counsel for Defendant Capital One
Financial Corporation*

26

1

**Attestation**

2          Under Civil Local Rule 5-1(i)(3), I hereby attest that the other signatory to

3    this document has concurred in its filing.

4

5                                                                              */s/ Ryan A. Shores*

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28